```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION AT DAYTON
                              -  -  -
 3    UNITED STATES OF AMERICA,      : CASE NO. 3:22-CR-077-TMR
                                     :
 4              Plaintiff,           :
           vs.                       :SENTENCING (Part 1)
 5                                   :
      TY BRANDON ROBERTS,            :AUGUST 31, 2023
 6                                   :9:00 A.M.
                Defendant.           :
 7                                   :
                                     :
 8                            -  -  -
                     TRANSCRIPT OF PROCEEDINGS
 9           BEFORE THE HONORABLE THOMAS M. ROSE,
           UNITED STATES DISTRICT JUDGE, PRESIDING
10                            -  -  -

11    APPEARANCES:
      For the Plaintiff:
12                        KELLY K. ROSSI, ESQ.
                          United States Attorney's Office
13                        200 W. Second Street
                          Suite 602
14                        Dayton, OH  45402

15    For the Defendant:
                          THOMAS W. ANDERSON, ESQ.
16                        Federal Public Defender's Office
                          1 South Main Street
17                        490 Fifth Third Center
                          Dayton, OH  45402
18
      Also Present:  Ty Roberts, Defendant
19
      Courtroom Deputy:  Elizabeth Penski
20
      Stenographer:      Mary Schweinhagen, RPR, RMR, RDR, CRR
21                       United States District Court
                         200 West Second Street, Room 910
22                       Dayton, Ohio 45402

23
          Proceedings reported by mechanical stenography,
24    transcript produced by computer.
                              *** *** *** ***
25
```

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1                          **INDEX OF WITNESSES**

2                                   DIRECT   CROSS   REDIRECT   RECROSS

3      **PLAINTIFF'S WITNESSES**

4      ANDREA KINZIG                62      92       105

5

6      **DEFENSE'S WITNESSES**

7      DR. JENNIFER O'DONNELL        20      38        55

8

9                          *     *     *     *     *

10

11                         **INDEX OF EXHIBITS**

12     **PLAINTIFF'S**              ADMITTED

13      1 - 8                       107

14

15                         *     *     *     *     *

16

17

18

19

20

21

22

23

24

25

```
 1              P-R-O-C-E-E-D-I-N-G-S                  9:10 A.M.
 2          THE COURT:  We're before the Court this morning in
 3     the matter of the United States of America versus Ty Brandon
 4     Roberts.  This is Case Number 3-22-cr-77.  And we're here for
 5     the purposes of commencing a dispositional sentencing hearing
 6     for Mr. Roberts.
 7          Would counsel enter their appearance for the record.
 8          MS. ROSSI:  Good morning, Your Honor.  Kelly Rossi
 9     on behalf of the United States.
10          MR. ANDERSON:  Good morning, Your Honor.  Thomas
11     Anderson on behalf of the defendant.
12          THE COURT:  Previously, on June the 30th, 2022,
13     there was a 28-count indictment filed against Mr. Roberts
14     charging him with numerous offenses:  production of child
15     pornography, coercion and enticement, transfer of obscene
16     materials.
17          And then subsequently to that, on February the 1st, 2023,
18     Mr. Roberts did appear before the Court and entered pleas of
19     guilty to Counts 1 and 15 of the indictment.  Again,
20     Mr. Roberts pled guilty to Count 1, which was a count of
21     production of child pornography, in violation of 18, United
22     States Code, 2251(a) and (e); as well as Count 15, which is a
23     charge of coercion and enticement, a violation of 18, United
24     States Code, 2422(b).  Those pleas were made pursuant to a
25     plea agreement.
```

1        The Court considered the pleas and accepted the pleas and

2    made findings of guilty.  The Court referred, then, the matter

3    to probation for a presentence report and recommendation.  The

4    Court has now received that report and recommendation, has

5    reviewed such, and stands ready to proceed with this

6    dispositional hearing.

7        However, before we get started, the Court would just

8    confirm with counsel that they are indeed in receipt of the

9    report and its recommendations and that there are no

10   objections now pending.

11       Ms. Rossi.

12       MS. ROSSI:  Your Honor, that is correct, there are

13   no objections from the government.

14       THE COURT:  All right.  Mr. Anderson.

15       MR. ANDERSON:  Thank you, Judge.  We have received

16   the report.  There are no objections.

17       THE COURT:  All right.  Mr. Roberts, the way the

18   Court would proceed in dispositional hearings when there are

19   no objections to the report and recommendation of probation,

20   the Court will be considering your disposition by considering

21   seven factors of sentencing under 18, U.S.C., 3553.  One of

22   those factors is the advisory guideline calculation under the

23   United States Sentencing Guidelines.

24       So what I plan to do here is, first, the Court would

25   consider that factor, and I will consider the factor -- I will

1    consider the report and recommendation of probation.  I will

2    make my findings with regard to that factor.  I will then

3    share -- and I will share those findings with the record.  The

4    Court will then share with the record the parameters of

5    sentencing within which the Court will be considering your

6    disposition as called for by the statutes that govern those

7    violations, as well as a result of the Court's findings with

8    regard to the guideline calculations.

9         Then, once the Court has done that, the Court will afford

10   an opportunity for counsel to present any evidence, testimony,

11   or whatever they wish to present at that point in time with

12   regard to the factors of sentencing.

13        My understanding is there are several witnesses, one I

14   believe by the government, one called on your behalf.  And

15   then once the Court has heard those witnesses, the testimony

16   or evidence that's presented, the Court does plan to recess

17   this dispositional hearing, affording an opportunity for

18   counsel to submit to the Court briefing with regard to the

19   factors of sentencing in light of the evidence that was

20   presented in addition to and supplementing the report and

21   recommendation.

22        The Court will then reconvene the hearing, and at which

23   time the Court will afford an opportunity for counsel to argue

24   to the Court the factors of sentencing and what they believe a

25   sentence is that meets the goals of sentencing but is not more

1    than necessary.  Of course, at that point in time you also, if

2    you so desire, will be given an opportunity to address the

3    Court with regard to disposition.

4         Also, the Court at that point in time, as part of the

5    government's case, would afford an opportunity, if any victim

6    wishes to present any statement or victim impact statement at

7    that point in time, the Court would consider that.

8         Once that is all done, then the Court will be sharing

9    with the record its findings with regard to the guideline

10   calculations -- I'm sorry.  Not the guideline calculations --

11   with regard to the factors of sentencing and impose

12   disposition.

13        Do you understand how I'm going to proceed?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Any questions, Mr. Anderson?

16             MR. ANDERSON:  No, Your Honor.  Thank you.

17             THE COURT:  Ms. Rossi?

18             MS. ROSSI:  No, Your Honor.  Thank you.

19             THE COURT:  All right.  Well, as I indicated, since

20   there were no objections to the report and recommendation, the

21   Court, as I indicated, has reviewed the report and

22   recommendation and specifically with regard to the guideline

23   calculation, the recommendation of probation.

24        After that review and there being no objections to the

25   guideline calculation, the Court is going to adopt the report

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    and recommendation in total.  The Court does that in

2    conformity with the Supreme Court cases of *Booker* and *Fanfan*

3    and while utilizing the 2021 edition of the guidelines manual.

4        The Court does find that in this case -- well, the Court

5    is going to share the Court's specific findings with regard to

6    the record.

7        The Court finds that Mr. Roberts has two counts of

8    conviction.  Count 1 charged production of child pornography,

9    in violation of 18, United States Code, 2251(a) and (e); and

10    Count 15 charged coercion and enticement, a violation of 18,

11    United States Code, 2422(b).

12        Pursuant to Guideline 3D1.1(a), when a defendant has been

13    convicted of more than one count, the Court shall group the

14    counts resulting in conviction into distinct groups of closely

15    related counts by applying the rules specified in Guideline

16    3D1.2, then determine the offense applicable to each group by

17    applying the rules specified in 3D1.3, and finally, determine

18    the combined offense level applicable to all groups taken

19    together by applying the rules specified in 3D1.4.

20        According to Appendix A, the applicable guideline for

21    Count 1 is located in Guideline 2G2.1, The Sexual Exploitation

22    of a Minor.  And the applicable guideline for Count 15 is

23    located in Guideline 2G1.1 or 2G1.3.

24        The Court finds, as recommended, that the most analogous

25    guideline for Count 15 is Guideline 2G1.3, which is The

1    Promoting of Commercial Sex Act or Prohibited Sexual Conduct

2    with a Minor; Transportation of Minors to Engage in Commercial

3    Sex Act or Prohibited Sexual Conduct; Travel to Engage in

4    Commercial Sex Act or Prohibited Sexual Conduct With a Minor;

5    Sex Trafficking of Children, Use of Interstate Facilities to

6    Transport Information About Minors.

7        The counts of conviction do not meet the provisions of

8    Guideline 3D1.2 as recommended, and the Court so finds, as the

9    counts do not involve the same victim, and one count does not

10   embody conduct that is treated as a specific offense

11   characteristic in guidelines applicable to another of the

12   counts.

13       Additionally, the offenses calculated under 2G2.1 are

14   specifically excluded from the grouping rules for closely

15   related counts under Guideline 3D1.2(d).  As a result,

16   Mr. Roberts's counts shall be scored as separate and distinct

17   groups with a combined total offense level to be determined

18   pursuant to 3D1.4.

19       Count 1, the Production of Child Pornography.  The

20   offense level is determined on the basis of all acts and

21   omissions committed, aided, abetted, counseled, commanded,

22   induced, procured, or willfully caused by the defendant that

23   occurred during the commission of the offense of conviction,

24   in preparation for that offense, or in the course of

25   attempting to avoid detection or responsibility for that

1    offense.

2        Count 1 charges one Polaroid Roberts produced of Minor A.

3    However, the government indicted Counts 1 through 9 occurring

4    in one larger occurrence when Minor A spent the night with

5    Roberts.  As such, all nine Polaroids Roberts produced of

6    Minor A occurred during the commission of the offense or in

7    preparation for that offense, and the conduct in those nine

8    images will be used in determining the total offense level as

9    recommended.

10        The Court finds that according to Guideline 2G1.1 the

11    base offense level, therefore, for Count 1 is an 32.

12        The Court does find that there are specific offense

13    characteristics that apply to Count 1, and that base offense

14    level, pursuant to Guideline 2G1 -- I'm sorry -- 2G2.1(b)(1),

15    if the offense involved a minor who had not attained the age

16    of 12 years, there is an increase of 4 levels; or attained the

17    age of 12 years but not attained the age of 16 years, there is

18    an increase of 2 levels.

19        Pursuant to the investigation in the information before

20    the Court and consistent with the statement of facts that have

21    been accepted, Mr. Roberts produced Polaroid photographs of

22    Minor A from February 1, 2007, to February 23, 2008, when the

23    victim was 11 or 12 years old.

24        The government indicated, due to the age of the offenses,

25    there was no way to determine if the victim was 11 or 12 years

1    old from when Polaroid images were produced.  As such, in due

2    deference to the defendant, the enhancement under Guideline

3    2G2.1(b)(1)(B) is appropriate; and therefore, there is a

4    2-level increase in the base offense level.

5        The Court further finds that pursuant to Guideline

6    2G2.1(b)(2)(A) if the offense involved the commission of a

7    sexual act or sexual contact, there is an increase of 2

8    levels.  According to 18, U.S.C., 2246(2)(B), "sexual act"

9    includes contact between the mouth and penis, the mouth and

10   the vulva, and the mouth and the anus.  The Polaroid images

11   show Roberts performing oral sex on Minor A and Minor A

12   performing oral sex on Roberts.  Therefore, the 2-level

13   increase is appropriate and warranted.

14       The Court further finds that pursuant to Guideline

15   2G2.1(b)(5), if a defendant was the parent, relative, or legal

16   guardian of the minor involved in the offense, or if the minor

17   was otherwise in the custody, care, or supervisory control of

18   the defendant, there is an increase of 2 levels.

19       In determining whether to apply this adjustment, the

20   Court has looked at the actual relationship that existed

21   between the defendant and the minor and not simply to the

22   legal status of the defendant-minor relationship.

23   Accordingly, to the investigation and again consistent with

24   the statement of facts that has been accepted, Mr. Roberts

25   produced Polaroid images of child pornography involving Minor

1      A while Minor A was staying with Roberts.  As such, Minor A

2      was in Roberts's custody, care, and control, and the 2-level

3      adjustment -- 2 level, additional 2-level adjustment is

4      appropriate.

5           The Court does not find other adjustments to be

6      appropriate, and therefore, the Court finds that Mr. Roberts's

7      adjusted offense level for Count 1 is a 38, with the base

8      offense level and then adding the three specific offense

9      characteristics.

10          Count 15, Coercion and Enticement.  The guideline for a

11     violation of 18, United States Code, 2422(b) is Guideline

12     2G1.3.  Under subdivision (c)(1) of that guideline, if the

13     offense involved causing, transporting, permitting, or

14     offering or seeking by notice or advertisement a minor to

15     engage in sexually explicit conduct for the purpose of

16     producing a visual depiction of such conduct, the Court is to

17     apply 2G2.1 if the resulting offense level is greater than

18     determined in 2G1.3.

19          The adjusted offense level under 2G1.3 was determined to

20     be 32 based on the base offense level of 28 under 2G1.3(a)(3)

21     and a 2-level enhancement under 2G1.3(b)(2) and (b)(3), and

22     the Court would so find.  Therefore, the offense level under

23     2G2.1 results in the greater adjusted offense level, and the

24     cross reference is applied.  So, therefore, the Court does

25     find, in accordance with 2G2.1, the base offense level to be a

1    32.

2        The Court also finds, again, that there are specific

3    offense characteristics that apply.  Pursuant to

4    2G2.1(b)(1)(B), if the offense involved a minor who attained

5    the age of 12 years but not 16 years, there is an increase of

6    2 levels.  Accordingly, the investigation, and consistent

7    again with the statement of facts, Minor C was 12 years old at

8    the time of the offense, and therefore, a 2-level increase is

9    warranted.

10       Also, according to 2G2.1(b)(6), if for the purpose of

11   producing sexually explicit material or for the purpose of

12   transmitting such material live the offense involved the use

13   of a computer or an interactive computer service, or

14   participation with a minor -- to solicit participation with a

15   minor in sexually explicit conduct, there is an increase of 2

16   levels.

17       Again, according to the investigation and, again,

18   consistent with the facts accepted between August the 19th,

19   2014, and September the 6th, 2014, Mr. Roberts used his iPod

20   Touch to communicate with Minor C, a 12-year-old living in

21   Texas at the time, via the Kik Messenger application.  During

22   the communication, Roberts posed as a 14-year-old girl and

23   solicited sexually explicit images from Minor C.  Minor C

24   produced and sent two images depicting child pornography to

25   Roberts in direct response to the request.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

 1          As such, the Court finds that the 2-level increase is

 2     appropriate, therefore, making Mr. Roberts's adjusted offense

 3     level for Count 15 a 36.

 4          Pursuant to the Court's previous findings, the Court

 5     would calculate a multiple-count adjustment for the combined

 6     adjusted offense level.  According to Guideline 3D1.4(a), in

 7     determining the number of units, counts as one unit the group

 8     with the highest offense level and count one additional unit

 9     for each group that is equally serious or from one to four

10     levels less serious.

11          So Count 1 with the adjusted offense level of a 38 is

12     entitled to 1 unit.  Count 15, which has an adjusted offense

13     level of 36, is equal to 1 unit.  Therefore, the total number

14     of units that would be applied for this calculation is 2.

15          The greater of the adjusted offense levels, again, is a

16     38.  And pursuant to Guideline 3D1.4, if the number of units

17     equals 2, the highest offense level shall be increased by 2

18     levels.  So, therefore, Mr. Roberts's combined adjusted

19     offense level would therefore be a 40.

20          Finally, pursuant to Guideline 4B1.5, the defendant meets

21     the criteria, the Court finds, of repeat and dangerous sex

22     offender against minors.  The Court specifically finds that

23     according to Guideline 4B1.5(b), in any case in which a

24     defendant's instant offense of conviction is a covered sex

25     crime and the defendant engaged in a pattern of activity

1    involving prohibited sexual conduct, the offense level shall

2    be increased by 5 levels and the criminal history category

3    shall be the criminal history category determined under

4    Chapter 4, Part A.

5         According to Application Note 2 and for the purposes of

6    this guideline, the instant offense of conviction must be a

7    covered sex crime, an offense perpetrated against a minor

8    under (ii), Chapter 110 of Title 18, or Chapter 117 of Title

9    18.

10        The counts of conviction for Mr. Roberts that were

11   perpetrated against minor were under Chapter 110 and Chapter

12   117 of Title 18.  Therefore, the Court finds that they are

13   covered sex crimes.

14        Additionally, according to Application Note 4(B)(i), the

15   defendant engaged in a pattern of activity involving

16   prohibited sexual conduct if on at least two -- if on at least

17   two separate occasions the defendant engaged in prohibited

18   sexual conduct with a minor.

19        And according to the Application Note 4(A), the

20   definition of "prohibited sexual conduct" means any offense

21   described in 18, U.S.C., 2426(b)(1)(A), or the production of

22   child pornography.  Such definition under 2426(b)(1)(A)

23   includes any violation under Chapter 110 and Chapter 117,

24   which the Court has found these are.

25        Application Note 4(B)(ii) specifies that an occasion of

1    prohibited sexual conduct may be considered without regard to

2    whether the occasion occurred during the course of an instant

3    offense or resulted in a conviction for the conduct that

4    occurred on that occasion.

5        In this case, the investigators determined that

6    Mr. Roberts used various Internet-based platforms to

7    communicate with minors around the world to produce child

8    pornography.  He frequently pretended to be minor -- a minor

9    teenage girl to entice and coerce minor boys to create/send

10   sexually explicit images and videos of themselves to

11   Mr. Roberts.

12       Mr. Roberts, while tricking minor boys into thinking they

13   were communicating with a minor girl, manipulated the minor

14   boys into producing child pornography and sending it to him.

15   Mr. Roberts used gift cards to Internet-based gaming platforms

16   to entice and coerce the minor boys to create and send

17   Mr. Roberts sexually explicit images and videos of themselves

18   and/or other minor boys.

19       More than 11,000 images and videos of child pornography,

20   including hundreds of images of videos -- and videos Roberts

21   himself had produced and coerced and enticed minors to produce

22   from his residence.  Of the hundreds of child pornography --

23   of the hundreds of child pornography files produced,

24   investigators were able to identify 44 victims, most of which

25   were between the ages of 11 and 14 when the images were

1   produced.  He specifically produced images of Minor A engaged

2   in sexually explicit conduct with him while Minor A was under

3   his care, custody, and control.  While posing as a 14-year-old

4   girl online, he coerced Minor C to produce and send child

5   pornography images of himself to Mr. Roberts.

6       Roberts's pattern of conduct encompasses a period of

7   approximately 15 years and involves at least 44 victims that

8   have been identified and several others who were not

9   identified.  As such, the Court finds that the 5-level

10  enhancement for repeat and dangerous sex offender against

11  minors is applicable and therefore is applied, therefore,

12  making Mr. Roberts's adjusted offense level with the Chapter 4

13  enhancement a 45.

14      The Court does find, however, that Mr. Roberts has

15  demonstrated at this time an acceptance of responsibility for

16  his offense and is entitled to a 2-level decrease under

17  3E1.1(a), as well as timely notifying the authorities of his

18  intention to plead and entitling him to an additional 1-level

19  reduction under 3E1.1(b).  Therefore, Mr. Roberts's total and

20  final offense level, the Court finds, is a 42.

21      The Court -- having made those findings, the Court would

22  just share with the record the parameters of sentencing within

23  which the Court will be considering disposition.

24      For Count 1 the minimum term of imprisonment is 5 years

25  and the maximum term is 30 pursuant to 18, U.S.C., 2251(e).

1     For Count 2, the minimum term of imprisonment is 10 years and

2     the maximum term is life pursuant to 18, U.S.C., 2422(b).

3          Based upon the guidelines, with the total offense level

4     of 42, which the Court has found, and the Court has also

5     found -- the Court also finds that Mr. Roberts's criminal

6     history category is a I, the guideline imprisonment range is

7     360 months to life.  And since that applicable guideline range

8     is in Zone D of the sentencing table, the minimum term must be

9     served by a sentence of imprisonment.

10         After any term of incarceration, under the statute there

11    would be a term of supervised release, which could be at

12    least -- which would be at least five years up to life on both

13    counts.  Those multiple terms of supervised release shall run

14    concurrently.  Under the guidelines, supervised release shall

15    not be less than the minimum term of years specified for the

16    offense, five years on both counts under subdivisions (a)(1)

17    through (3), and may be up to life if the offense is a sex

18    offense.

19         Mr. Roberts is not eligible for probation consideration.

20         With regard to fines, the maximum fine on both counts is

21    $250,000.  There are also special assessments of $100 on each

22    count pursuant to 18, U.S.C., 3013.  There are additional

23    assessments imposed under Section 3013 of $5,000 each count on

24    any nonindigent person.

25         Count 1, the defendant is also subject to the provisions

1    of the Amy, Vicki, and Andy Child Pornography Assistance Act

2    of 2018, in addition to any other criminal penalty,

3    restitution, or special assessment authorized by law. And the

4    Court shall not assess more than $50,000 on any person

5    convicted of this.

6        Guidelines: The guideline range for a fine, if one were

7    to be imposed, is within the range of 25,000 to 250,000

8    pursuant to Guideline 5E1.2(c)(3).

9        Restitution under both the statute and the guidelines is

10   mandatory.

11       Those are the parameters of sentencing within which the

12   Court will be considering disposition.

13       The Court will now afford an opportunity for counsel to

14   address the Court -- well, the Court will afford counsel an

15   opportunity to present any evidence or testimony that they

16   wish to present with regard to the factors of sentencing

17   and/or disposition, mitigation of disposition.

18       As I indicated, we are going to basically be hearing

19   testimony and/or evidence here presented today. I'm reserving

20   the right for counsel to argue their case at a later date.

21   But this gives the Court an opportunity -- or it gives counsel

22   an opportunity to brief whatever evidence is presented to me

23   today with regard to disposition and then, therefore, the

24   Court an opportunity to consider that prior to their arguments

25   and, of course, any possible statement from Mr. Roberts and/or

1    victim -- or victims of the offense.

2         So with that, it is also my understanding that counsel

3    has agreed to present testimony a little out of the normal

4    order.  Is that correct, Ms. Rossi?

5         MS. ROSSI:  That is correct, Your Honor.

6         THE COURT:  It's my understanding, Mr. Anderson, you

7    have a witness that needs to -- is limited in her

8    availability, and so, therefore, you wish to go first with

9    regard to the presentation.

10         MR. ANDERSON:  That is correct, Judge.

11         THE COURT:  You may.

12         MR. ANDERSON:  Thank you.  Your Honor, thank you.

13    At this time I would call Dr. Jennifer O'Donnell.

14         THE COURT:  Okay.

15         **DR. JENNIFER O'DONNELL, DEFENSE WITNESS, SWORN**

16         THE COURT:  Before we get started, it's my

17    understanding that there is a -- you can have a seat.

18         It's my understanding that there is a report.  Ms. Rossi,

19    you have seen the report?

20         MS. ROSSI:  I have, Your Honor.

21         THE COURT:  Thank you.  Go ahead.

22         MR. ANDERSON:  Your Honor, thank you.  And I know

23    Dr. Donnell has a copy of her report.  I could have it marked

24    to refer to it for identification --

25         THE COURT:  That would be fine.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - DIRECT                                    20

1              MR. ANDERSON:  -- as Defendant's Exhibit 1.

2              THE COURT:  All right.

3              MR. ANDERSON:  I do plan on filing the report under

4    seal when I do submit my post-hearing memorandum, but I will

5    have the witness refer to her report.

6              THE COURT:  All right.

7              MR. ANDERSON:  Thank you.

8                        **DIRECT EXAMINATION**

9    BY MR. ANDERSON:

10   **Q.**   Good morning, Dr. O'Donnell.  Could you please identify

11   yourself and spell your name for the court reporter?

12   **A.**   Yes.  Jennifer O'Donnell, O-apostrophe-capital-

13   D-O-N-N-E-L-L.

14   **Q.**   And, Dr. O'Donnell, where are you presently employed?

15   **A.**   I am the CEO and legal examiner at the Forensic

16   Evaluation Service Center, and I also have a private

17   practice.

18   **Q.**   Okay.  And how long have you been employed with the

19   forensic center?

20   **A.**   The second time of employment there started in 2010,

21   and then that agency morphed into the current agency in

22   2016.

23   **Q.**   So you are a psychologist?

24   **A.**   Yes, I am a psychologist.

25   **Q.**   And just briefly, could you give your educational

DR. JENNIFER O'DONNELL - DIRECT                                    21

1    credentials?

2    **A.**   I have a doctorate in psychology from Xavier

3    University.  I completed that in 2001 and became licensed to

4    practice in Ohio in December 2002.  I've been practicing

5    ever since.

6         I recently became licensed to practice temporarily in

7    Idaho, and I have a PSYPACT license as well.

8    **Q.**   And can you briefly just give the Court a sense of what

9    your current employment entails?

10   **A.**   Yes.  So my full-time employment is as the, like I

11   said, CEO of a forensic center, one of the ten certified

12   forensic centers in the state of Ohio.  I created that

13   nonprofit in 2016.  And now I manage a full-time forensic

14   director, also a psychologist for contract psychologists to

15   psyche assistance, and I think my admin team is up to five

16   now.

17   **Q.**   Okay.  When you talk about forensic psychology, could you

18   just give a brief description of what you mean by forensic

19   psychology?

20   **A.**   Yes.  I specialize in assessment work, court-ordered

21   evaluations across the state of Ohio.  We primarily are --

22   my agency is primarily funded to do competency insanities,

23   post-NGRI evaluations.  We also do several -- several other

24   post-conviction evaluations, mitigations at the state -- in

25   the state court level.

DR. JENNIFER O'DONNELL - DIRECT                    22

1      We also have an intervention-in-lieu-of-conviction

2   clinic.  We do outpatient competency restoration for a

3   six-county region and actually around the state as well.

4      I have a private practice that primarily focuses on the

5   new 2929, severely mentally ill statute, as well as second

6   and third opinions for competency insanity.

7   **Q.**   Let's talk about sex offenders for a moment.

8   **A.**   Okay.

9   **Q.**   In your experience in forensic psychology in doing

10  evaluations for criminal defendants, have you performed

11  evaluations in whatever capacity for defendants who have been

12  convicted of sex offenses?

13  **A.**   Yes, many times.  Because of my age, I have been in the

14  field now for 20-some years, and when I was still pre-

15  licensed, so I worked as a psychology assistant and post-doc

16  psychologist in the late '90s, when the statute 2950 had

17  been revealed in Ohio, and that required the courts to go

18  back to anyone who had been convicted of a sex offense and

19  be re-evaluated under what we colloquially called the

20  (i)(3)(J) criteria to determine the level of sex offender

21  status.

22  **Q.**   If I could stop you right there.  What about your

23  experience with sex offenders who have committed offenses

24  against minors, have you had experience with those types of

25  defendants?

DR. JENNIFER O'DONNELL - DIRECT                              23

1    **A.**    Yes.  In my 20-some years of practice, the demographics

2    of the victims have ranged from very young all the way to

3    extremely old.

4    **Q.**    And you mentioned something about a classification system

5    in Ohio state court; is that correct?

6    **A.**    Yes.  There is something called the 2950, I think is

7    the statute number.  I did over, in the late '90s -- I tried

8    to check the numbers on this, but I don't have access to

9    that agency's records anymore because I am no longer there.

10   I did over 70 2950 evaluations in the late '90s to 2001 when

11   I finally became licensed.  Since then, I've done about

12   three dozen of those, is my estimate.  It's hard to check

13   records across agencies, though.

14   **Q.**    So as part of your specialty, courts, state courts would

15   employ you to evaluate sex offenders, including sex offenders

16   with minor victims, to assess them for purposes of

17   registration in state court; is that fair?

18   **A.**    Exactly.

19   **Q.**    And you would apply some criteria to sex offenders,

20   including sex offenders with minor victims, to inform the

21   court as to how they should have to register or how they

22   should be classified with respect to dangerousness and the

23   seriousness of their offenses; is that correct?

24   **A.**    That's correct.

25   **Q.**    Now, obviously, Dr. O'Donnell, my office hired you; is

DR. JENNIFER O'DONNELL - DIRECT                    24

1    that correct?

2    **A.**    That's correct.

3    **Q.**    And my office is paying you?

4    **A.**    Yes.

5    **Q.**    And the purpose of my office involving you was to have

6    you do a forensic evaluation of Mr. Roberts; is that correct?

7    **A.**    Correct, for post-conviction.

8    **Q.**    Right.  Now, obviously, the federal system does not have

9    the type of classification system that the state court does,

10   but this judge is required to evaluate the dangerousness

11   Mr. Roberts poses now and may pose when he is released, as

12   well as treatment options that are available to him.  And you

13   have listened to the judge basically go through Mr. Roberts's

14   offenses of convictions; is that correct?

15   **A.**    That's correct.

16   **Q.**    And I believe in preparation for your evaluation you did

17   review the presentence investigation report that was prepared

18   in this case?

19   **A.**    I did.

20   **Q.**    And I believe that's a very thorough document that

21   basically details the facts that Mr. Roberts has admitted to?

22   **A.**    That's correct.

23   **Q.**    Now, Dr. O'Donnell, could you please just briefly tell

24   the Court what else you did in preparation for your evaluation

25   of Mr. Roberts?

DR. JENNIFER O'DONNELL - DIRECT                    25

1    **A.**   Yes.  So I first reviewed the presentence investigation

2    report and the nature of the charges so that I understood

3    what the nature of the mitigation factors were likely to be.

4    Then I evaluated Mr. Roberts starting on June 16th.  He was

5    being held at the Butler County Jail.  I saw him for two,

6    two and a half hours on the first visit, and then I returned

7    June 27th for an additional 90 minutes to finish the

8    evaluation.

9    **Q.**   So if I could stop you right there.  So you met -- after

10   you reviewed the collateral information about the charge --

11   **A.**   Yes.

12   **Q.**   -- you met individually alone with Mr. Roberts at the

13   jail; is that right?

14   **A.**   Yes.

15   **Q.**   And I believe you said you spent approximately two and a

16   half hours with him on the first visit?

17   **A.**   That's correct.

18   **Q.**   And then you saw him again for an additional hour and a

19   half?

20   **A.**   Correct.

21   **Q.**   So, roughly, you've spent about four hours speaking with

22   Mr. Roberts while he's been in jail?

23   **A.**   That's the face-to-face, yes.

24   **Q.**   Right.  And then, obviously, you generated a report based

25   on your findings; is that correct?

DR. JENNIFER O'DONNELL - DIRECT                          26

1   **A.**   Yes.

2   **Q.**   And you also subjected Mr. Roberts to some testing that's

3   reflected in your report; is that correct?

4   **A.**   That's correct.

5   **Q.**   Do you do that pretty much with every offender that you

6   evaluate?

7   **A.**   That's my routine for the mitigation evaluations, yes.

8   **Q.**   Understood.  Now, if you have a copy of your report,

9   which I'll refer to as Defendant's Exhibit 1, I'd like to have

10  you turn to page 8.  And I want to start with the Summary

11  that's contained in your report.

12  **A.**   Okay.

13  **Q.**   As we've indicated, you have read the presentence report

14  in this case?

15  **A.**   Yes, that's correct.

16  **Q.**   And you feel you understand the conduct that Mr. Roberts

17  has admitted to; is that correct?

18  **A.**   Yes, I do.

19  **Q.**   And you're also aware that the sentencing guidelines in

20  this case call for a sentence of 360 months, or 30 years, to

21  life; is that correct?

22  **A.**   I am now, yes.

23  **Q.**   And you understand that Mr. Roberts is subjected to a

24  15-year mandatory minimum; is that right?

25  **A.**   Yes.

DR. JENNIFER O'DONNELL - DIRECT                27

1    **Q.**   Now, if I could turn your attention to the second full

2    paragraph under the heading of Summary on page 8.  And if we

3    could go down eight lines to the sentence that begins with the

4    word "Fortunately."  Do you see that?

5    **A.**   Okay.  Yes.

6    **Q.**   Could you just please read that sentence starting with

7    the word "Fortunately"?

8    **A.**   Okay.  "Fortunately for Mr. Roberts and the community,

9    this defendant does not have a propensity for violence and

10   is expressing contrition and the desire to learn how to

11   change his behavior."

12   **Q.**   And obviously, you made that statement in your written

13   report?

14   **A.**   Correct.

15   **Q.**   Now, with respect to -- let me back up.  Why is it

16   important in your opinion, Doctor, to assess whether you

17   believe a defendant has a propensity for violence?  And I

18   would assume in this context we are talking about sexual

19   violence.

20   **A.**   So the importance there is the classification of the

21   individual with regard to the benefits of treatment.  So the

22   different treatment models -- we started, we being the field

23   of mental health, started doing sex offender treatment, I

24   mean, in the 1900s for sure, but more recently starting in

25   the 1970s when we began treatment, we would treat all sex

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - DIRECT                    28

1  offenders in the same manner.  And what we found -- there's

2  quite a bit of research now -- but what we found is that sex

3  offenders who are inherently violent and have a propensity

4  for violence not only in their sexual acts but in the rest

5  of their lives in general are a different kind of offender

6  and require a much different kind of intervention and have

7  poorer outcomes for intervention.

8  Q.   And I would assume, Doctor, you have done evaluations for

9  courts, maybe for a prosecutor's office and maybe for defense

10  counsel, where you have determined that an offender did have a

11  propensity for sexual violence; is that correct?

12  A.   Extreme violence, yes.

13  Q.   Now, with respect to this case, is it your opinion still

14  that based on your evaluation of Mr. Roberts and the testing

15  that you've employed and your understanding of his offense

16  conduct, do you believe that Mr. Roberts falls into that

17  category of a sexual offender with a propensity for violence?

18  A.   No violence.

19  Q.   Okay.  And not to put words in your mouth, Doctor, but

20  you indicated that the reason you assess that is because

21  that's imperative for how someone is treated or how they

22  should be treated moving forward; is that correct?

23  A.   Correct.

24  Q.   Okay.  Now, Doctor, if I could turn your attention back

25  to page 8 of your report.

DR. JENNIFER O'DONNELL - DIRECT                    29

1    You mentioned something called dialectical behavioral

2    therapy; is that correct?

3    **A.**   That's correct.

4    **Q.**   Could you just give the Court an idea of what dialectical

5    behavioral therapy is?

6    **A.**   So like I mentioned back in the '70s when we started

7    doing therapy with sex offenders in a systematic way --

8    before that we really weren't, but back in the '70s I got

9    wind of this systematic stuff -- by the '90s, we had evolved

10   our treatment modalities to following a very proscribed

11   doctrine of intervention under a protocol called cognitive

12   behavioral therapy.

13       Also in early 2000s, dialectical behavioral therapy was

14   a new type of treatment under the cognitive behavioral

15   model.  So if you think about -- I use my hands a lot.  I'm

16   sorry.  But if you think about the big umbrella of therapy,

17   cognitive behavioral therapy is well-known.  It's change in

18   thinking, thinking for a change.  The typical criminal

19   justice intervention models, they're all cognitive

20   behavioral therapy based.

21       Dialectical behavioral therapy is under that CBT

22   umbrella, and it actually focuses on the emotional

23   regulation of an individual.  So we have the overarching

24   protocol for cognitive change, thinking change, but under

25   DBT, we have the opportunity to work with an individual to

DR. JENNIFER O'DONNELL - DIRECT                                    30

1    develop their emotions in a more sophisticated manner, to

2    help them mature emotionally.

3    **Q.**   I'd like to stop you there, because you talked about

4    emotional immaturity.

5    **A.**   Yes.

6    **Q.**   And obviously in your review of the presentence report,

7    you understand that the victims in this case are boys ranging

8    in the age of, the majority, 11 to 14 or 15.  There was some

9    contact on the Internet, I believe, with boys that may have

10   been younger than that, but certainly primarily what we're

11   talking about here is Mr. Roberts's interaction with teenage

12   boys?

13   **A.**   Correct.

14   **Q.**   Now, as opposed to just cognitive behavioral therapy --

15   **A.**   Um-hmm.

16   **Q.**   -- if I understand you correctly, dialectical behavioral

17   therapy goes to helping a defendant perhaps mature

18   emotionally?

19   **A.**   Exactly.

20   **Q.**   Now, in your interactions with Mr. Roberts, I know that

21   you have not classified him as being a violent sexual

22   offender, but were you able to come to any conclusions or draw

23   any conclusions about Mr. Roberts's emotional maturity?

24   **A.**   Yes.

25   **Q.**   Could you please inform the Court of what your assessment

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - DIRECT                    31

1    was after meeting with Mr. Roberts?

2    **A.**   Yes.  But I want to bracket it with that there are --

3    there are no scientific measurements of maturity.  I can't,

4    like, assign an age and say at this -- there are

5    developmental milestones.  He's met his developmental

6    milestones.  He can live independently, drive a car, learns

7    to manage money, things like that.

8         His social maturity, though, is very impaired.  He -- I

9    would estimate, if I were trying to assign an age

10   appropriate level to his social maturity, he's about 14.  He

11   has not matured in the way that a typical healthy adult will

12   mature.  There are several reasons for that.  I went into

13   those in the report.  Similar to a drug abuser or someone

14   who has been horrifically abused during their childhood,

15   people get stuck at maturity levels.  In my estimation, in

16   my clinical experience, Mr. Roberts is stuck in those early

17   teen years.  Not as an excuse of his behavior, but that is

18   where he is emotionally.

19   **Q.**   And you did mention that there were some factors that you

20   believe that you've identified that help explain that.  Could

21   you just please give a couple of examples of those for Judge

22   Rose?

23   **A.**   Yes.  I think it is significant.  I don't normally -- I

24   don't typically talk about an individual's sexual

25   orientation in my evaluations unless it's highly relevant.

1    But in this case, I believe it's extremely relevant.

2         Mr. Roberts's sexual orientation became a factor in his

3    development because he recognized early on that he was

4    likely a gay man, gay boy at that point in time, but could

5    not express that or learn how to correctly express his

6    sexual orientation.  And he described, as did his brother,

7    the environment in the household that not only his sexual

8    orientation but also the emotional and literal stability of

9    the household was in jeopardy for most of his lifetime.  And

10   that is a classic pattern that will get someone stuck in a

11   particular level of maturity.

12   **Q.**   Now, Doctor, what is your assessment of Mr. Roberts's

13   ability as an adult to maintain appropriate relationships with

14   people his own age?

15   **A.**   He's extremely socially awkward.  He's -- he would be

16   considered reclusive as an adult.  I mean, this is a man who

17   he went to work every day, but he didn't have an active

18   adult interaction social life outside of any work

19   interactions that he had.

20   **Q.**   And, Doctor, you know, since the advent of the Internet,

21   I would assume you deal with a lot of individuals who, because

22   of their social awkwardness, resort and turn to the Internet

23   because it is a way for them to have interaction from a very

24   safe distance, oftentimes from their own basement.  Is that

25   something you've seen in your work?

1   **A.**   Interacting anonymously.  It's very safe.  They think

2   it's safe.  It's not.

3   **Q.**   And certainly, I believe in your evaluation you do

4   believe that Mr. Roberts did have an addiction, an addiction

5   to the Internet, an addiction to pornography; is that correct?

6   **A.**   Gaming, pornography, yeah.

7   **Q.**   In your experience, Doctor, are those things that can be

8   worked through in a therapeutic environment?

9   **A.**   Yes.  The research on gaming and pornography addiction

10  is not robust; the research is not robust on that.  But the

11  research on sexual offending, inappropriate sexual

12  behaviors, and the interventions in that is very robust.

13  And especially in the late 1990s, we really developed some

14  very effective protocols.

15       There is quite a bit of research that shows offenders

16  who get a long-term, evidence-based sexual offending

17  intervention program with monitoring over a long term, even

18  monitoring over longer than a five-year period, will show at

19  least a 4 to 8 percent decrease in sexual offending

20  recidivism versus offenders who get no treatment at all,

21  especially if these are offenders who have no history of

22  violence.  That violence factor is extremely important in

23  predicting future recidivism.

24  **Q.**   And again in your opinion, we're not dealing with that in

25  Mr. Roberts's case?

DR. JENNIFER O'DONNELL - DIRECT                              34

1   **A.**    Correct.  We're not.

2   **Q.**    And if I could go back again to the dialectical

3   behavioral therapy in page 8 of your evaluation, the last

4   sentence on page 8 that begins with "Mr. Roberts," could you

5   please read that for the record?

6   **A.**    "In my opinion, Mr. Rogers -- Mr. Roberts is a good

7   candidate for this intervention model as it can address the

8   interpersonal skill and emotional dysregulation deficits

9   that I believe are the foundation for his sexual offending,

10  and treatment will decrease the likelihood of recidivism."

11  **Q.**    Now, Doctor, are you familiar with what kind of sex

12  offender treatment is available in the Federal Bureau of

13  Prisons?

14  **A.**    The Bureau of Prisons does have a cognitive

15  behavioral -- the overarching cognitive behavioral model of

16  intervention.  I have not researched the models in the last

17  two or three years, but I am familiar with their cognitive

18  behavioral models.

19  **Q.**    And how important is it, in your opinion, Doctor, for

20  someone to take advantage of therapy sooner rather than later?

21  In other words, what would your recommendation be for

22  Mr. Roberts to start getting this type of therapy to address

23  the underlying causes of his behavior?

24  **A.**    Well, I'm well aware that when I write these reports,

25  they don't often get into the prisons or the next

DR. JENNIFER O'DONNELL - DIRECT                    35

1    institution.  But when they do, I have been told by state

2    prison authorities and mental health units in their state

3    prisons that they use the information that I give them and

4    they help enroll people earlier in those programs.

5         We know there is very strong research that says if

6    someone fails treatment, so if they were to fail out for

7    some reason or another, the likelihood of recidivism

8    actually goes up.  We know that that's a personality --

9    there's personality factors about failure.

10        What we don't know is how soon after he gets in he

11   needs the treatment.  I can't tell you exactly how early, if

12   early enrollment will help, but what we do know is the

13   longer someone is engaged in treatment, in an effective

14   treatment program and the longer the monitoring goes on

15   after that the better the results are.

16   **Q.**   And again, Doctor, in your opinion, in your evaluation of

17   this defendant, is he someone who you believe, as he sits here

18   today, is amenable to treatment?

19   **A.**   I do think so, yes.

20   **Q.**   Doctor, how important is it for you that Mr. Roberts has

21   completely admitted all of his conduct?

22   **A.**   The research is not strong on admission of guilt or not

23   admission of guilt.  I believe maybe we haven't been able to

24   figure out how to measure that, in fact.  So my clinical

25   opinion, I can't tell you how important it is that he

1    express guilt.

2        It is important, I believe, that he express the

3    symptoms and how he recognizes the symptoms have interfered

4    in his life, because that level of discomfort, discontent

5    inside him will then give him more motivation to seek relief

6    in treatment.

7    **Q.**   And, Doctor, is it your opinion, after your evaluation of

8    the defendant, that he does have insights into his offense

9    behavior?

10   **A.**   He absolutely understands how destructive his behavior

11   is to himself and others.

12   **Q.**   And do you believe he is willing to engage in therapy to

13   move past his offense conduct?

14   **A.**   Yes, he talked to me about trying to find his own means

15   of therapy while he was in the jail, trying to get self help

16   books and things like that.  That's great.  That's not my --

17   I hope we can get him into an evidence-based protocol

18   program, a valid program.  But that is encouraging.

19   **Q.**   Let's talk a little bit about recidivism.  Obviously, the

20   judge could sentence Mr. Roberts anywhere from 15 years to

21   life imprisonment.  Let's just assume for the moment that

22   Mr. Roberts does not get out of federal prison for the next 16

23   or 17 years.  That would put him over 50 years of age.

24   **A.**   Okay.

25   **Q.**   Doctor, in the research, is there anything significant

DR. JENNIFER O'DONNELL - DIRECT                    37

1    about recidivism rates for individuals who have attained a

2    certain age?

3    **A.**    Yes.  I talked about that a little bit in my report.

4    So I used two instruments to think about Mr. Roberts's

5    proclivity for criminal thinking and his actuarial risk for

6    sexual recidivism.

7         The second instrument, it starts on page 7, the Static-

8    99, that is an actuarial instrument for recidivism.  So that

9    allows for no criminal judgment.  That's what an actuarial

10   instrument is.  It's what insurance companies use to figure

11   out, like, life insurance risk and things like that.

12        So those factors on the Static-99 -- it is actually

13   called Static-99 because it was first published in 1999.

14   It's been modified a couple times since then.  Those factors

15   are clear that age does have a predictive value in

16   estimating risk.  And younger men, younger men, those two

17   factors, younger and men, do have a higher risk of

18   recidivism.

19        Mr. Roberts is already above the cut age, the first cut

20   age for the decrease in score.  So the way the actuarial

21   instruments work, similarly to the sentencing guidelines, is

22   if a criteria is met, you get a point for that.  There are

23   some criteria, though, if it is met, it will deduct a point

24   or recognize a reduction in risk.

25        So at his age of -- he's now 38.  If he goes into

1    prison and is there for actually more than 12 years at this

2    point, his score will actually decrease as long as he

3    doesn't commit any other sexual offenses.

4    **Q.**   And that is something that is borne out by research?

5    That's not speculative?  There's enough data now to actually

6    make those predictive recidivism rates?

7    **A.**   Right.  The Static-99 is, like I said, started in 1999,

8    so 24 years old.  It is looking at actuarial data for over

9    tens of thousands of sexual offenders.  By definition,

10   sexual offenders.  So it's a very robust instrument.

11            MR. ANDERSON:  Your Honor, I don't believe I have

12   anything additional for Dr. O'Donnell.

13        Thank you, Doctor.

14            THE COURT:  All right.  Now, Doctor, Ms. Rossi is

15   going to have a few questions for you.

16            THE WITNESS:  That's great.

17                      **CROSS-EXAMINATION**

18   BY MS. ROSSI:

19   **Q.**   Good morning, Dr. O'Donnell.

20   **A.**   Hi.  Is it Rossi, R-O-S-S-I?

21   **Q.**   That's correct.

22   **A.**   Nice to meet you.

23   **Q.**   Nice to meet you, too.  Thank you for being here this

24   morning to share some information with us.

25        I had a couple of questions in response to the direct

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - CROSS                                      39

1   examination that Mr. Anderson just performed.  He asked if

2   your purpose was to perform a forensic evaluation, and I

3   believe you added the caveat that it was forensic evaluation

4   for post conviction.  Did I hear that right?

5   **A.**   That's correct.

6   **Q.**   And I believe that he asked you, are the tests you

7   administered to Mr. Roberts routine for forensic evaluation,

8   and again I believe I heard you say it's routine for

9   mitigation evaluations --

10  **A.**   Yes.

11  **Q.**   -- is that right?

12  **A.**   Yes.

13  **Q.**   So it's fair to say that if your goal was not for

14  mitigation but to rather, let's say, have as full or

15  comprehensive knowledge as possible about Mr. Roberts's

16  offenses and his various factors that might make him more

17  likely to re-offend, you may have administered different

18  tests?

19  **A.**   No, I don't think so.  And I think I understand your

20  question.  Because this is not a competency evaluation, I

21  didn't use competency --

22  **Q.**   Right.

23  **A.**   -- oriented testing.  So that's what I was referring

24  to.

25  **Q.**   Okay.

DR. JENNIFER O'DONNELL - CROSS                                    40

1    **A.**    Because this is about mitigation evaluation, so we're

2    going to do a full psychological assessment on Mr. Roberts,

3    I used instruments that specifically go to a psychological

4    assessment.

5    **Q.**    Right.  And actually, I'd like to talk a little bit more

6    about that.  One of the tests you did was a personality

7    assessment inventory, correct?

8    **A.**    Correct.

9    **Q.**    And that is a self-reported personality assessment

10   instrument, right?

11   **A.**    They all are, yes.

12   **Q.**    So you are relying on what information Mr. Roberts

13   provides?

14   **A.**    Sort of.  The interesting --

15   **Q.**    Just in terms of what the test asks, it asks for

16   information from Mr. Roberts, correct?

17   **A.**    Right.  He answers it true/false.

18   **Q.**    Okay.  And then you would agree with me that this type of

19   test, specifically the PAI, it's used in a variety of legal

20   contexts, right?

21   **A.**    Yes.

22   **Q.**    Not just criminal.  In fact, it's mostly used in civil

23   cases; isn't that right?

24   **A.**    So --

25   **Q.**    Let me ask you a different question.  It is used in

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - CROSS                               41

1   cases, for example, when you are calculating personal injury

2   damages for someone who is injured in an accident, that's an

3   example when PAI might be used?

4   **A.**   It could be.

5   **Q.**   Or a child custody dispute, right?

6   **A.**   Could be.

7   **Q.**   You might -- okay.

8        Or ascertaining whether someone meets the criteria for

9   getting Social Security Disability payments?

10  **A.**   Yes.

11  **Q.**   So it's fair to say that this PAI test is in no way

12  specifically designed to evaluate sex offenders; is that fair?

13  **A.**   That's correct.

14  **Q.**   Okay.  And same kind of question with the Interview of

15  Risk, Need, Responsivity test, IORNS.  Do you say "IORNS"?

16  **A.**   I say "IORNS," yes.

17  **Q.**   Okay, thank you.

18       Like the PAI, this is also a self-reported test, correct?

19  **A.**   Yes.

20  **Q.**   Where you rely on information that Mr. Roberts gives in

21  response to questions?

22  **A.**   That's correct.

23  **Q.**   And that's a true or false test as well?

24  **A.**   That's correct.

25  **Q.**   On page 7 of your report, which is Defense Exhibit 1 --

DR. JENNIFER O'DONNELL - CROSS                                42

1    do you have a copy of your report there with you?

2    **A.**    I do.

3    **Q.**    In the section where you are talking about the overall

4    risk index, you mentioned it's comprised of three influencing

5    variables, and after reviewing those variables you found that

6    Roberts fell in the, quote, moderately high risk, end quote,

7    category; is that right?

8    **A.**    That's correct.

9    **Q.**    How many categories are there?

10   **A.**    There are five categories.

11   **Q.**    So am I --

12   **A.**    It starts with low and goes up.

13   **Q.**    So am I correct that your conclusion is that Mr. Roberts

14   is in the second highest risk index?

15   **A.**    Correct.

16   **Q.**    Okay.  Just to make sure I understand the full scope of

17   your evaluation, you would agree with me that there are

18   additional or different tests other evaluators might have used

19   when they were assessing Mr. Roberts?

20   **A.**    Yes.  Oh, yeah, there's a plethora of tests people

21   could use.

22   **Q.**    Right.  So I think some of them might be the Minnesota

23   Multiphasic Personality Inventory 2?

24   **A.**    They could.

25   **Q.**    The Multiphasic Sex Inventory II For Adult Men?

DR. JENNIFER O'DONNELL - CROSS                                          43

1    **A.**   It could have.

2    **Q.**   Or The Molester Comparison Scale?

3    **A.**   I'm not familiar with that one.

4    **Q.**   Well, it's fair to say that there are different tests out

5    there that specifically are designed for sex offenders, and

6    specifically male sex offenders, correct?

7    **A.**   Correct.  The gold standard is the Static-99, though.

8    **Q.**   So I guess to kind of wrap this one up, you agree that in

9    your field of expertise different experts may use different

10   tests and may reach different conclusions?

11   **A.**   Oh, yeah.

12   **Q.**   So I'd like to talk a little bit about the facts you

13   relied on in preparing your report.

14   **A.**   Okay.

15   **Q.**   So at the time you authored this report, which was in

16   June; is that right?

17   **A.**   Yes.  So I saw him in June, June 16th of 2023, and then

18   I finished the report July 3rd.

19   **Q.**   Okay.  So between that time of June 16th and July 3rd

20   when you were working on this report, were you aware

21   specifically that Mr. Roberts had produced child pornography

22   involving 177 different minors?

23   **A.**   I had the presentence investigation report, yes.

24   **Q.**   Right.  And that number 177 is not in there, correct?

25   **A.**   I don't recall the number of victims, you're correct.

DR. JENNIFER O'DONNELL - CROSS                                    44

1    **Q.**   Okay.  Well, I will tell you, it's not in there.  So this
2    is new information, the exact number.
3    **A.**   I actually got -- was given your paperwork for today,
4    the six exhibits, I think.  So it might have been in there.
5    **Q.**   Yes.
6    **A.**   Okay.
7    **Q.**   I was not aware that you were that also relying on my
8    exhibits as part of your testimony.
9    **A.**   I was given it yesterday, so --
10   **Q.**   But when you authored your report, it's fair to say you
11   did not have that information?
12   **A.**   I did not have that number, that's correct.
13   **Q.**   Okay.  And, again, when you wrote this report, you were
14   not aware that Roberts himself is personally responsible for
15   producing or causing other minors to produce 718 videos and
16   images of child pornography?
17   **A.**   I did not include that number in my report, you're
18   right.
19   **Q.**   I'd like to refer again to the PSI.  You mentioned you
20   had the chance to review that.  Page 24 of the PSI, if I could
21   give a copy of that to you.
22   **A.**   Okay.
23          THE COURT:  What are we referring to?
24          MS. ROSSI:  The presentence investigation report.
25          THE COURT:  You have that, don't you, Mr. Anderson,

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - CROSS                                    45

1      in front of you?

2              MR. ANDERSON:  I do.  Thank you.

3              THE WITNESS:  Is this on the right page?

4      BY MS. ROSSI:

5      Q.    It is.  It should be page 24 of 49 at the top.

6      A.    Okay.  Oh, 24 of 49, okay.

7      Q.    Yes.  So if you go to paragraph 73, the first two

8      sentences are, "On two separate occasions in the early 2000s,

9      two of Roberts's then toddler-aged relatives made statements

10     indicating Roberts had engaged in sexually explicit conduct

11     with them.  The Clark County Sheriff's Office investigated the

12     allegations, and Roberts declined to provide any statements to

13     deputies.  No charges were filed in this case."

14         Do you recall reading that in the PSI?

15     A.    Yes.

16     Q.    Now, turning to your report, on page 7, paragraph 3 --

17     and again, that's Defense Exhibit 1 -- you report that the

18     defendant does not have a history of early criminal behavior

19     or delinquent juvenile behavior.

20         So I want to understand, are you aware that that incident

21     in the early 2000s was actually when Mr. Roberts was a

22     juvenile?

23     A.    But he was not convicted, isn't that correct?

24     Q.    That is correct.  So you are only counting convictions?

25     A.    That's right.

DR. JENNIFER O'DONNELL - CROSS                                      46

1    **Q.**   Okay.  So any allegations of contact offenses are not

2    considered in your evaluation?

3    **A.**   They can't be.

4    **Q.**   Okay.  And I understand that, but that's a limitation,

5    correct?

6    **A.**   That is a limitation, correct.

7    **Q.**   And you would agree with me that sexual offenses are, the

8    research shows, one of the most underreported crimes to begin

9    with, right?

10   **A.**   That's correct.

11   **Q.**   And in addition to being one of the most underreported

12   crimes, they are also one of the most underreported prosecuted

13   crimes, correct?

14   **A.**   Unfortunately.

15   **Q.**   Yes.  So you would agree with me, then, that in this type

16   of offense we're dealing with a dearth of data in terms of

17   evaluating what someone's behavior actually is, just because

18   of the nature of the offense?

19   **A.**   Can you rephase that for me?

20   **Q.**   Absolutely.

21   **A.**   Thank you.

22   **Q.**   So sex offenses are underreported?

23   **A.**   Yes.

24   **Q.**   They are underprosecuted?

25   **A.**   Yes.

DR. JENNIFER O'DONNELL - CROSS                              47

1   **Q.**   Normally when you are assessing someone for risk, it's

2   important to know what criminal convictions they have in their

3   past, right?

4   **A.**   Correct.

5   **Q.**   So if you are evaluating someone for sexual offense risk,

6   just because of the nature of those crimes and the

7   underreporting and underprosecution, it's fair to say that

8   there is less data, there's going to be less convictions for

9   you to refer to or use in your assessment?

10  **A.**   Yes.

11  **Q.**   All right.  So turning to page 8 of your report, you

12  write -- and let me see if I can find exactly where you write

13  this.

14        Okay, the second paragraph under the Summary section.

15  **A.**   Yes.

16  **Q.**   "Mr. Roberts is a 38-year-old gay man who is hiding his

17  sexual orientation from his family, friends, and community out

18  of shame and fear of retaliation."

19        And then later in that paragraph you write, quote, "The

20  defendant was, therefore, unable to explore his sexual

21  orientation and learn appropriate ways to express himself and

22  his sexual and emotional needs.  Unfortunately became fixated

23  on pubescent boys and turned to very immature behaviors as

24  well," end quote.  And did I get that right?

25  **A.**   Yes.

DR. JENNIFER O'DONNELL - CROSS                    48

1    **Q.**   Okay.  Are you aware that Roberts's production and

2    contact offenses, in fact, involved prepubescent boys and

3    girls?

4    **A.**   There was some references, as you said, in the PSI.

5    However, convictions.

6    **Q.**   Correct.  So if it were the case that he had at least 11

7    contact offenses with minors as young as 3 years old spanning

8    to as old as 13 when the contact offenses began, that not

9    having convictions for those offenses but having committed

10   them would have been important for you to know in forming an

11   opinion?

12   **A.**   Had he been convicted of them, I would have been able

13   to include them in the record.

14   **Q.**   So you are not taking that into account essentially when

15   you reach your conclusions?

16   **A.**   That's not completely true.  I absolutely use my

17   clinical judgment on his need for intervention and how

18   serious of a case this is.  So, in fact, I did consider it.

19   I couldn't include it in actuarial instruments or, as you

20   said, in the PAI.  Is certainly showed up in the IORNS.

21       But in the reality, it's part like a bowl of wax,

22   right.  And he absolutely needs an intervention to stop

23   these behaviors, and that's sort of where I ended up.  So

24   they are sort of included.  I don't want you to think that I

25   have excluded any victims in any way.

DR. JENNIFER O'DONNELL - CROSS                                    49

1   **Q.**   No, I appreciate that.

2   **A.**   The seriousness was never -- I never took that for

3   granted.

4   **Q.**   Okay.  But it's fair to say that you just didn't have the

5   information about these contact offenses that were alleged to

6   have occurred, correct?  Other than what's mentioned in the

7   PSI.

8   **A.**   Other than what's mentioned in the PSI.

9   **Q.**   So, for example, you didn't see police reports that his

10  3-year-old relative was taken to a doctor and the doctor

11  concluded that it was probable that she had been sexually

12  assaulted in exactly the way the children had described he had

13  done?  You didn't have access to that information, right?

14  **A.**   Correct.

15  **Q.**   So I want to talk to you a little bit about Mr. Roberts's

16  sexuality.  I think you took, you know, pains to address that

17  in your report, as well as in your testimony today, and I do

18  appreciate that very much.  But I want to get something -- I

19  want to make sure I understand it correctly.

20       You would agree with me that being sexually attracted to

21  a same-sex partner is not the same thing as being sexually

22  attracted to prepubescent children, right?

23  **A.**   Absolutely.

24  **Q.**   So turning to page 3 of your report, I believe that you

25  wrote, quote, "Still, his only true long-standing romantic

DR. JENNIFER O'DONNELL - CROSS                              50

1    relationship was with a man several years younger than him,"

2    end quote.

3         Is that right?

4    A.   Yes.  And I found out earlier the exact nature of that,

5    so --

6    Q.   Okay.  So let me go ahead and ask you a little bit about

7    this.

8    A.   Okay.

9    Q.   Is it correct that Mr. Roberts did not tell you the

10   nature of that relationship, which is that it began when the

11   minor victim was 13 and Mr. Roberts was 32?

12   A.   I did not know that that's when it began.  Thank you.

13   Q.   And did you know that it spanned five years while the

14   minor was, in fact, a minor?

15   A.   I did know that.

16   Q.   Okay.  You would agree with me that a relationship

17   between a 13-year-old child and a 32-year-old man could not be

18   accurately described as a romantic relationship, right?

19   A.   Not a consensual relationship, that's exactly right.

20   Q.   Okay.  I wanted to actually get clarification on

21   something in your report on page 8.  You wrote, quote, "His

22   male victims are strangers and unrelated, and those are known

23   risk factors for recidivism," end quote.  Do you see where

24   that is?  It's in the top paragraph on the page.

25   A.   Yeah, I do know that.

                    *Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - CROSS                                          51

1    **Q.**   So forgive me.  I think there is some ambiguity here with

2    what exactly you mean.  Are you saying that the victims are

3    strangers and unrelated to each other, or are you saying the

4    victims are strangers unrelated to Mr. Roberts?

5    **A.**   Unrelated to Mr. Roberts.

6    **Q.**   Okay.  I just wanted to make sure I understood that

7    correctly.

8         So also on page 8 of your report -- and I think you

9    talked about this a little bit with Mr. Anderson -- you wrote

10   that "The deciding factor about who was likely to re-offend,

11   even for sex offenders, is typically criminogenic behavior,

12   such as --

13        (Court Reporter interruption for speed.)

14   **Q.**   "-- a history of criminogenic behaviors, such as a

15   history of criminal behavior, antisocial personality,

16   propensity for violence," end quote.

17        And then you concluded that Mr. Roberts does not have a

18   history of those criminogenic factors; is that right?

19   **A.**   That's right.

20   **Q.**   And is that because you were defining criminal behavior

21   and propensity for violence in a narrow way, such as previous

22   convictions?

23   **A.**   In the actuarial sense.

24   **Q.**   Okay.  So it's not taking into account his previous

25   contact offenses with minors that did not result in

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - CROSS                              52

1    convictions?

2              THE COURT:  Was that an answer?

3              THE WITNESS:  So it is not taking into account any

4    action that he was not convicted of.  That's --

5    BY MS. ROSSI:

6    **Q.**  Okay.

7    **A.**  So that's the thing about an actuarial instrument,

8    right.  It doesn't have -- there is no wiggle room in the

9    interpretation of the criteria.

10   **Q.**  And I really do appreciate your explaining that to me.  I

11   want to make sure that I understand essentially the parameters

12   of the data you are working with in reaching these

13   conclusions, and the parameters of that data is limited to

14   criminal convictions?

15   **A.**  Correct.

16   **Q.**  I also want to talk about how sex offenders are generally

17   classified from study to study.  Would you agree with me that

18   that term can mean different things in different studies and

19   may include public indecency or voyeurism?  In some cases,

20   they may only include rape, or child molestation in others?

21   **A.**  That's correct.  The research varies significantly.

22   And that's what I was talking about we were trying to get a

23   handle on, on, you know, rape is a violent offense.  Is

24   voyeurism a violent offense?  I mean, that's where the gray

25   area becomes in the research.

DR. JENNIFER O'DONNELL - CROSS                                    53

1    **Q.**   Right.  And again, you are talking about convictions, not

2    behavior?

3    **A.**   In the research, we can talk about behavior.

4    **Q.**   Oh, you can.  Great.  Well, then, I would like to know if

5    the research takes into account behavior such as kidnapping

6    and murder, whether or not it results in a conviction, and

7    does it recognize it while they may appear on their face to be

8    non-sexual in nature, that they can, in fact, have a sexual

9    motivation for certain factors?

10   **A.**   Yes, it does.

11   **Q.**   So you would agree with me that the lack of criminal

12   convictions for what's on its face apparently sexual behavior

13   is not necessarily indicative of whether or not a sexual

14   offender is likely to re-offend sexually?

15   **A.**   So when we're doing these kinds of assessments, if we

16   can determine that the conviction was sexually related, you

17   know, someone breaks into an apartment to steal underwear --

18   **Q.**   Um-hmm.

19   **A.**   -- or to rape someone, then that can count in the

20   actuarial model.  There are ways that that conviction can

21   count.

22   **Q.**   Okay.  And does that differ from study to study or based

23   on what the study's looking for?

24   **A.**   So the reason that I use the Static is that they have

25   adhered to very specific criteria for a very long time now,

DR. JENNIFER O'DONNELL - CROSS                                54

1   and that the criteria are solid.  Other instruments you

2   mentioned -- I forget which one --

3   **Q.**   Minnesota Multiphasic Personality --

4   **A.**   That's not it.  The one about the molesters something.

5   **Q.**   Child molestation?

6   **A.**   Yeah.  So a lot of the less often used instruments have

7   either broader or narrower definitions, and it's one of the

8   reasons I don't use them, because I tend -- well, I always

9   work in a sort of broad field.  I can get -- any kind of an

10  evaluation can come my way.  So I want to use the instrument

11  that's most widely used in that circumstance.  And that's

12  why I stick with the Static.

13       But to your point, the research will have to -- a good

14  research publication will have to clearly define those

15  categories, and those categories do change from research to

16  research.

17  **Q.**   And so it sounds like you are testifying that it's

18  important to know, in each specific research paper you are

19  quoting or citing or using, exactly what the definitions are,

20  exactly what's being actually measured and tested?

21  **A.**   That's correct.

22  **Q.**   Okay.  And just to finish up, I know you spoke with

23  Mr. Roberts for four hours one on one; is that right?

24  **A.**   Yeah, I did.

25  **Q.**   Okay.  Just to make sure I understand, you did not

DR. JENNIFER O'DONNELL - REDIRECT                    55

1    actually speak to any victims in this case, right?

2    **A.**    Oh, no.

3    **Q.**    And you didn't speak to any law enforcement officers who

4    had knowledge of the case, right?

5    **A.**    All I had was the -- I had -- I asked for the

6    discovery, and I got the presentence investigation, so --

7    **Q.**    Okay.  Would you agree with me that receiving the full

8    discovery might aid in you forming an opinion?

9    **A.**    So that's also a great debate in my field.

10   **Q.**    I said "might aid."

11   **A.**    So maybe.

12   **Q.**    Okay.

13   **A.**    I'll throw you a maybe.

14   **Q.**    Fair enough.  Fair enough.

15        I don't think I have any other questions, Dr. O'Donnell.

16   Thank you very much for your time.

17   **A.**    You're welcome.

18        THE COURT:  Mr. Anderson, anything?

19        MR. ANDERSON:  Just very briefly based on counsel's

20   questions.

21        THE COURT:  All right.

22                    **REDIRECT EXAMINATION**

23   BY MR. ANDERSON:

24   **Q.**    Doctor, Ms. Rossi had discussed with you that -- and you

25   are aware -- that there are a number of minor victims in this

DR. JENNIFER O'DONNELL - REDIRECT                    56

1   case that Mr. Roberts communicated with over the Internet; is

2   that correct?

3   **A.**   That's correct.  I've been aware of that the whole

4   time.

5   **Q.**   Right.  And Mr. Roberts has acknowledged that during

6   these communications with these minor adolescent boys the

7   majority of them were adolescent boys.  There may have been

8   some that were under the age of 11.

9           MR. ANDERSON:  Judge, I think that Ms. Kinzig will

10  get into that.  But the vast majority are between, I believe,

11  the ages of 11 and 14?

12          MS. ROSSI:  Your Honor, and I apologize to

13  Mr. Anderson.  I just want to be clear that that is not going

14  to be the government's evidence when Agent Kinzig testifies.

15  So if you want to rephrase your question, that will not be our

16  position.

17  BY MR. ANDERSON:

18  **Q.**   Nevertheless, we are talking about interactions that

19  Mr. Roberts had with boys, from various ages.

20  **A.**   Children.

21  **Q.**   Children, okay.  And you are aware of that?

22  **A.**   Absolutely.

23  **Q.**   And you're aware of the nature of those interactions.

24  Sometimes Mr. Roberts deceived them and pretended to be a

25  teenage girl?

1   **A.**    Absolutely.

2   **Q.**    Now, of course we're not discounting each individual

3   victim, and each individual victim deserves to be heard.  But

4   from a clinical perspective, if that number was 100 and

5   because of the nature of the Internet and how easy it is to

6   connect with children on the Internet, if that number was 100

7   or if that number was 600 -- and I'm just throwing out

8   numbers -- does that number at a certain point change the kind

9   of therapy that Mr. Roberts would need to engage in?

10  **A.**    In fact, if the number were 4 versus 100, it wouldn't

11  change my conclusion about the kind of therapy that

12  Mr. Roberts needs.

13  **Q.**    And from your evaluation of Mr. Roberts, although this

14  conduct that he engaged in on the Internet is clearly improper

15  and clearly illegal, it is not the type of violent sexual

16  predation that would concern you from a clinical standpoint;

17  is that fair?

18  **A.**    That's a little strong.  So can I say it in my way?

19  **Q.**    Please.

20  **A.**    So he is not someone who is inclined to use physical

21  violence against his victim, other than sexual violence is

22  violence.  I'm going to put that parenthetical over there.

23  He is not someone who's inclined to use physical violence.

24  I talked about the guy that breaks in, right.  And that

25  tells me, that -- the research tells me, not Mr. Roberts,

DR. JENNIFER O'DONNELL - REDIRECT                                          58

1    not his self report, but the research tells me that without

2    that physical violence component, we are not looking at a

3    sadistic psychopathic offender.  We are looking at a

4    habitual offender whose psychological problems,

5    psychological issues are contributing to this maladapted

6    behavior.  And so that tells me the kind of therapy -- which

7    was actually the question.  That's what a mitigation

8    question is, is what kind of therapy is needed to prevent

9    this recidivism or to decrease recidivism, if possible.

10          And so sorting him from a physically violent group of

11   individuals -- rapists, kidnappers, murderers -- into the

12   production category tells me the kind of therapy that will

13   most likely be the most effective for him.

14   **Q.**    Doctor, thank you for clarifying that.

15          MR. ANDERSON:  I have nothing additional.

16          MS. ROSSI:  Nothing, Your Honor.  Thank you.

17          THE COURT:  Doctor, I just have a couple questions.

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  We are talking about these different

20   tests, and the analytical test is what?

21          THE WITNESS:  The actuarial test --

22          THE COURT:  Actuarial.

23          THE WITNESS:  -- is the Static-99.

24          THE COURT:  And the Static-99 is the test that leads

25   you or indicates to you a recidivism rate?

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - REDIRECT                                    59

1           THE WITNESS:  Correct.  The likely recidivism, yes.

2   Do you want me to explain that?

3           THE COURT:  No, I think I understand.

4           THE WITNESS:  Perfect.

5           THE COURT:  Now, we've talked about a lot of

6   information here.  When that Static-99 was done, performed,

7   whatever, what extent of the information concerning

8   Mr. Roberts's past history was fed into that?  You had the two

9   convictions?

10          THE WITNESS:  No.  Those two convictions are

11  considered -- using the actuarial instrument and following the

12  rules of the actuarial instrument, those convictions are

13  considered the index offense.

14          THE COURT:  All right.

15          THE WITNESS:  So those convictions -- so let me say

16  it this way:  If we did that Static-99 for another reason 5

17  years or 20 years from now, those convictions would count, but

18  they wouldn't significantly raise his risk factor because of

19  the way it scores.

20          THE COURT:  I guess my bottom line is, I've listened

21  to a number of questions from both Mr. Anderson and Ms. Rossi.

22  It appears -- I'm somewhat concerned with regard to these

23  tests that were performed and the extent to which those tests

24  reflected what I've got here in front of me.

25          THE WITNESS:  I understand, Your Honor.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

DR. JENNIFER O'DONNELL - REDIRECT                    60

1           THE COURT:  Yeah.

2           THE WITNESS:  I understand.

3           THE COURT:  There seems to be a wide --

4           THE WITNESS:  So --

5           THE COURT:  That's a question.  Go ahead.

6           THE WITNESS:  I thought it was.  So, as I said to

7    Mr. Anderson, I did consider the magnitude of the repetition,

8    this pattern of behavior.  I'm not allowed to consider it on

9    the actuarial instrument, but I am allowed to consider it in

10   my clinical judgment and in my conclusions.

11          THE COURT:  Where did you come up with the -- where

12   did you come up with these percentages of recidivism?

13          THE WITNESS:  Those are from the actual instrument.

14          THE COURT:  So you weren't allowed to use it there?

15          THE WITNESS:  Not there.

16          THE COURT:  So basically, when we talk about 5.8 to

17   7 to, I don't know, 6 percent, that's a result of that test

18   based upon the information that was fed into it?

19          THE WITNESS:  Correct.

20          THE COURT:  I have nothing further.

21      Anything?

22          MS. ROSSI:  No, Your Honor.  Thank you.

23          THE COURT:  Mr. Anderson?

24          MR. ANDERSON:  No, Judge.  Thank you.

25          THE COURT:  Doctor, thank you very much.

DR. JENNIFER O'DONNELL - REDIRECT                61

1              THE WITNESS:  Thank you, Your Honor.

2              THE COURT:  You're excused.

3              THE WITNESS:  Thank you.

4              THE COURT:  Mr. Anderson, have you formally moved

5    for the admission of that?

6              MR. ANDERSON:  Judge, I was planning on attaching

7    the evaluation with my post-hearing submission.

8              THE COURT:  That's fine.

9              MR. ANDERSON:  So I just marked it as

10   identification, but I --

11             THE COURT:  And I'm assuming we are not going to

12   hear any objection from Ms. Rossi in any type of a response or

13   anything, right?

14             MS. ROSSI:  No objection to its admission.

15             THE COURT:  Okay.  Mr. Anderson, anything further?

16             MR. ANDERSON:  No additional witnesses, Judge.

17   Thank you.

18             THE COURT:  And again, understanding that I am

19   reserving your right, your opportunity and, of course,

20   Mr. Roberts's opportunity to address the Court and make

21   argument.

22        So we now turn to Ms. Rossi.

23             MS. ROSSI:  Thank you very much, Your Honor.  I do

24   have one exhibit that is a six-slide PowerPoint.  If I could

25   have a brief five-minute recess to make sure my computer works

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    with the courtroom technology.

2              THE COURT:  We will give you a brief, five-minute

3    recess.

4         Mr. Anderson, you have seen this?

5              MR. ANDERSON:  I have, Judge.  Thank you.

6              THE COURT:  Any objection to it?

7              MR. ANDERSON:  No.

8              THE COURT:  We'll take a five-minute recess.

9              MS. ROSSI:  Thank you, Judge.

10             THE COURTROOM DEPUTY:  All rise.  This court stands

11   in recess.

12        (Recess at 10:39 a.m. until 10:49 a.m.)

13             THE COURT:  We are back on the record.

14        Ms. Rossi.

15             MS. ROSSI:  Thank you, Your Honor.  At this time the

16   United States would like to call FBI Special Agent Andrea

17   Kinzig to the stand.

18             THE COURT:  All right.  Agent Kinzig, if you will

19   come up.

20             **ANDREA KINZIG, PLAINTIFF'S WITNESS, SWORN**

21             THE COURT:  Ms. Kinzig, you are familiar with the

22   courtroom.  Please try to keep your voice up so that everybody

23   can hear you.  And let's all talk moderately.  Slow down.

24                        **DIRECT EXAMINATION**

25   BY MS. ROSSI:

ANDREA KINZIG - DIRECT                                              63

1   **Q.**   Good morning, Agent Kinzig.

2   **A.**   Good morning.

3   **Q.**   Could you please spell your last name for the record?

4   **A.**   K-I-N-Z-I-G.

5   **Q.**   And where do you work?

6   **A.**   The Federal Bureau of Investigation.  I am currently

7   assigned to the Dayton Residency Agency of the Cincinnati

8   Field Office.

9   **Q.**   Are you a special agent?

10  **A.**   I am.

11  **Q.**   Can you generally describe what are your responsibilities

12  as a special agent with the FBI?

13  **A.**   I primarily work crimes against children and human

14  trafficking matters.

15  **Q.**   Approximately how long have you been involved in

16  investigating crimes against children?

17  **A.**   Since approximately 2012.

18  **Q.**   And you've received specialized training in this type of

19  investigative work?

20  **A.**   I have.

21  **Q.**   I would like to turn your attention to the screen.  Is

22  the slide showing?

23  **A.**   Yes.

24  **Q.**   Thank you.  How many minors during your investigation did

25  you determine that Roberts produced or coerced or enticed

1    those minors into producing child pornography?

2    **A.**   Approximately 177.

3    **Q.**   Of those minors, the 177, how many have you been able to

4    positively identify as of today's date?

5    **A.**   Approximately 57.

6    **Q.**   When was your most recent identification?

7    **A.**   I got the confirmation yesterday.  I believe the agent

8    conducted the interview two days ago, but she informed me of

9    the results yesterday.

10   **Q.**   So it's fair to say the investigation is ongoing as FBI

11   tries to determine all of the 177 victims?

12   **A.**   Yes.  There will be some victims who we won't be able

13   to identify based on lack of identifying information or the

14   fact that they live internationally, but we do continue our

15   efforts.

16   **Q.**   What is the total number of images or videos that

17   Mr. Roberts produced?

18   **A.**   Approximately 718, and that also includes ones that he

19   produced as well as coerced and enticed minors to produce,

20   including both videos and images.

21   **Q.**   Of those 718 videos and images, how many of those

22   involved one or more of the 57 identified minors?

23   **A.**   Approximately 505 of those files involved fully

24   identified victims.

25   **Q.**   How many child pornography investigations would you say

1    you've conducted, a rough ballpark estimate?

2    **A.**   I'd say over 100 in the past 11 years.

3    **Q.**   Where would you say this case ranks in terms of your

4    experience investigating someone producing images?

5    **A.**   It's always difficult to rank producers of child

6    pornography because all of the offenses are horrible in

7    different ways.  But given the fact that this case involves

8    a defendant who had multiple contact offenses with victims

9    as young as toddlers, produced child pornography involving

10   over 100 victims, and coerced and enticed hundreds of

11   victims over long periods of time to produce child

12   pornography, including victims as young as seven, I mean, I

13   would say that this is in the top 5 to 10 percent of most

14   serious offenders that I've investigated.

15   **Q.**   You were here when the defense expert witness,

16   Dr. O'Donnell, testified earlier this morning, right?

17   **A.**   I was.

18   **Q.**   Did you hear Dr. O'Donnell describe the defendant's

19   offenses involving, quote, "teenage boys," end quote, between

20   the ages of, quote, "11 to 14 or 15," end quote?  Did you hear

21   her testify to that?

22   **A.**   I did.

23   **Q.**   Do you agree with the accuracy of that characterization?

24   **A.**   That there certainly were victims in that age range,

25   but that does not include the -- the victims that have been

1     identified range in ages of 6 to 17 years old for production

2     of child pornography victims as well as contact victims as

3     young as toddlers.

4     **Q.**   So you just mentioned the range in age from 6 years old

5     to 17 years old.  Was there anything particularly egregious

6     about Mr. Roberts' conduct with the six-year-old victim you've

7     identified?

8     **A.**   Yes.  The six-year-old victim who's identified as Minor

9     SS, that is a particularly young and vulnerable age of a

10    victim to exploit online.  Mr. Roberts also coerced and

11    enticed this minor to engage in sexually explicit contact

12    via the Omegle application, which is an anonymous messenger

13    application that allows users to exchange simultaneous text

14    and video chats.  During that simultaneous text and video

15    chat via Omegle, which occurred around September 2021,

16    Mr. Roberts coerced and enticed Minor SS, who again is six

17    years old, to perform oral sex on his seven-year-old

18    brother, Minor TT.  And video recorded or screen recorded

19    that chat and saved it to his external hard drive.

20    **Q.**   Was this the only time you discovered that Mr. Roberts

21    coerced two brothers into performing sex acts on each other

22    for his benefit?

23    **A.**   No.  There were also two other siblings who he coerced

24    and enticed to engage in sexually explicit conduct with each

25    other.  Those would be Minors Q and R, who were

1    approximately 9 and 13 years old at the time.  Mr. Roberts

2    communicated with these two minors via the Skype live video

3    chatting application and recorded the chats with the screen

4    recording application.  During that chat, he coerced and

5    enticed the two minors to perform oral sex on each other and

6    to engage in anal sexual intercourse with each other.

7    **Q.**   And to be clear, Mr. Roberts video recorded this abuse?

8    **A.**   Yes.

9    **Q.**   Based on your training and experience, is there

10   additional trauma that is likely to result with the victims if

11   they are siblings being coerced into engaging in sexual acts

12   with each other?

13   **A.**   There are long-term effects that are known to be

14   involved in sibling incest, such as PTSD, anxiety,

15   depression, self-harming behavior, substance abuse, sexual

16   deviancy, to name a few.

17   **Q.**   Is it fair to say that that might influence the brothers'

18   lifelong relationship with each other moving forward?

19   **A.**   It would.  And at least one of the brothers has

20   exhibited behavioral problems in his teenage years.  You

21   know, I can't say for sure that it's the result of this

22   sibling incest, but it certainly is possible.

23   **Q.**   How many different states did the identified victims live

24   in?

25   **A.**   Approximately 25 for the fully identified victims.

1    There are -- the unidentified victims, there are results of

2    administrative subpoenas that have been issued that indicate

3    that some of the unidentified victims live in other

4    countries, such as United Kingdom, Sweden, and Australia, to

5    again just name a few.

6    **Q.**    During your investigation, did you learn whether

7    Mr. Roberts shared any of his child pornography with others?

8    **A.**    Yes.  He distributed child pornography to at least four

9    other individuals, distributed a total of approximately 29

10   files.  These files included images depicting Minors HZ and

11   JJ, which were files that those minors produced and sent to

12   Roberts at his request, as well as other child pornography

13   files.

14   **Q.**    So if I'm understanding you correctly, he actually

15   distributed to others the child pornography he had personally

16   caused to be produced?

17   **A.**    Correct.

18   **Q.**    Did I hear you right that -- or excuse me.  Have I asked

19   you the number of child pornography files Roberts possessed

20   and in what capacity or in what ways he possessed those

21   images?

22   **A.**    He possessed over 11,000 images and videos of child

23   pornography on a computer and iPod, as well as an external

24   hard drive, that were all recovered from his residence in

25   February 2022 pursuant to a search warrant.

1    **Q.**   Is it correct that there is an additional electronic

2    device that as of today you've not been able to review the

3    contents of?

4    **A.**   That is correct.  There was an iPhone that was seized

5    from his person pursuant to the February 2022 search warrant

6    that has not been examined yet.  When this device was

7    seized, officers requested Mr. Roberts to turn over the

8    device to them pursuant to the search warrant.  Instead of

9    immediately turning it over, he powered off the device,

10   which prevented officers from both obtaining a search

11   warrant to use biometrics to unlock the device, as well as

12   to submit it for a type of extraction that can be performed

13   on powered-on devices that provides results or most of the

14   contents but not all of the contents of the device.

15         He was asked for the password for the device.  He

16   declined to provide it.  So, therefore, it had to be

17   submitted to a forensic procedure that is kind of a slow

18   brute force process of cracking the pass code.

19         It has the -- it was submitted for that forensic

20   procedure in June of 2022 and has been running since that

21   time.  I was informed by the computer examiner just

22   yesterday that -- I assume it was yesterday -- that the

23   password had been discovered based on that forensic

24   procedure, and he was in the process of performing a

25   forensic extraction of the device.

1       So any child pornography files that would have -- that

2   would be located on what appear to be his primary iPhone

3   have not been discovered at this time.

4       Based on Roberts's long history of child pornography

5   activities, use of multiple devices to store child

6   pornography, use of multiple electronic accounts and his

7   declination to provide the pass code to it, I believe it's

8   likely that that device has more child pornography files and

9   more victims on it.

10  **Q.**   So putting aside the unknown files on this phone, of the

11  11,000 files that you have been able to review, did any of

12  those files contain particularly young victims or particularly

13  violent or sadomasochistic conduct?

14  **A.**   Yes, there were files that included infants or toddlers

15  and sadistic or masochistic abuse.

16  **Q.**   Okay.  I'd like to talk a little bit about the victims

17  that Mr. Roberts targeted.  Do you see Slide 3 presented on

18  the screen in front of you?

19  **A.**   I do.

20  **Q.**   Is what's contained on this slide accurate in terms of

21  what specific vulnerabilities some of his victims had?

22  **A.**   Yes.  This is a sample of some of the vulnerable

23  characteristics that some of the minors had.  They don't

24  include all of the vulnerable characteristics but, again,

25  just an example.

ANDREA KINZIG - DIRECT                                      71

1    **Q.**   As an example, what's a vulnerable characteristic that's

2    not included in this slide that you also observed?

3    **A.**   There was at least one other victim who had experienced

4    prior sexual abuse.  There were victims who had substance

5    abuse problems.  There were victims who came from

6    impoverished or broken homes.  Again, just naming some other

7    examples.

8    **Q.**   Mr. Roberts's conduct occurred in part during the

9    COVID-19 pandemic; is that correct?

10   **A.**   Yes.

11   **Q.**   In your opinion, based on your review of your

12   investigation, did he take advantage of the COVID-19 pandemic

13   to continue his abuse?

14   **A.**   Yes.  One of the social media applications that

15   Mr. Roberts did use to communicate with minors and to coerce

16   and entice minors to produce child pornography was the

17   Omegle application, which, again, is the anonymous messenger

18   application.

19        Mr. Roberts used the Omegle application during the

20   approximate time period of April 2019 through April 2021, so

21   that the start of that time period predates the COVID

22   pandemic by about six months in the United States but kind

23   of substantially reflects the period of the lockdown in most

24   states for the COVID pandemic.

25        I know that many minors during the COVID pandemic were

1    home much more frequently with little to no parental

2    supervision and had much more computer access for remote

3    learning and remote socialization.

4        During that time period that Mr. Roberts used the

5    Omegle application, I was able to see and determine that he

6    was able to communicate with substantially more minors than

7    the other -- than what he used other applications during

8    different time periods.

9        Specifically, just again in comparing the use of this

10   application, the Omegle application to other applications, I

11   saw that he was able to communicate with at least six times

12   more minors than he had with any other application; that he

13   was able to produce at least two times more child

14   pornography than any other application; and he was able to

15   communicate with significantly younger minors than other

16   applications, including minors as young as six and seven,

17   Minors SS and TT that we previously talked about.

18   **Q.**   Thank you.  I've now put on the screen in front of you

19   the next slide with the topics Roberts's attempted and actual

20   contact offenses.

21       THE COURT:  Ms. Rossi, just to clarify, this is all

22   part of the government's exhibit?

23       MS. ROSSI:  This slide is its own exhibit.  It's --

24   the slide show is Exhibit 8.

25       THE COURT:  So we are referring to Exhibit 8?

ANDREA KINZIG - DIRECT                                          73

1          MS. ROSSI:  I apologize, Your Honor.  You are

2    absolutely correct.

3          THE COURT:  So for the purposes of the record,

4    Exhibit 8 is basically the slides that have been displayed and

5    have been testified to up to this point in time?

6          MS. ROSSI:  That is correct, Your Honor.  Thank you.

7          THE COURT:  So we're now talking about Exhibit 8 and

8    slide what?

9          MS. ROSSI:  4.

10         THE COURT:  4.

11         MS. ROSSI:  Thank you so much, Your Honor.

12   BY MS. ROSSI:

13   **Q.**   Agent Kinzig, based on your investigation, how many

14   different victims of hands-on offenses, meaning victims that

15   Mr. Roberts conducted hands-on offenses against, have you

16   identified?

17   **A.**   If you include both actual contact offenses as well as

18   attempted or grooming behaviors, attempted offenses or

19   grooming behaviors that Mr. Roberts engaged in with minors,

20   I determined it to be 11.  That includes five toddler-age

21   relatives who are referred as Minors 1 through 5.  His

22   cousin, Minor A, who was 11 to 12 years old at the time of

23   the exploitation; a online acquaintance, Minor E, who he

24   later developed a personal relationship with.  Minor E was

25   13 to 18 years old at the time of the abuse; a nephew of his

1    roommate, who was referred to as Minor YY and was 9 to 13

2    years old at the time of the abuse; an unknown female who

3    was sleeping in his residence when Mr. Roberts took erotic

4    photographs of her; and then two minor males, Minors 6 and

5    7, who were 11 and 8 years old at the time of the conduct

6    that Mr. Roberts engaged in contact or grooming behaviors

7    with while working as a cashier.

8         I think we should note that Minors 1 -- the conduct

9    involving Minors 1 through 7 was previously reported to law

10   enforcement.  No charges were filed as a result of those

11   allegations.  Based on my review of reports and just what I

12   know about these type of investigations, it appeared that

13   most of the cases were declined for prosecution based on the

14   ages of the victims, as well as the lack of corroborating

15   evidence.

16        The offense conduct involving Minors A, E, and YY were

17   never reported to or known by law enforcement until the

18   current investigation.

19   **Q.**   Thank you.  I would like to just briefly touch on the

20   specific offense with regards to Minors 3, 4, and 5.  Am I

21   correct that that was a hands-on offense that occurred in

22   2005?

23   **A.**   Correct.

24   **Q.**   And what was Mr. Roberts's relationship to Minors 3, 4,

25   and 5?

ANDREA KINZIG - DIRECT                                          75

1     **A.**    He was their cousin.

2     **Q.**    And what happened, generally speaking?

3            MR. ANDERSON:  Your Honor, I know this is a

4     sentencing hearing and the rules of evidence are lax, but I'm

5     going to have to object to the characterizations of these as

6     being contact offenses.  And I'm happy to put that on the

7     record now if the Court would like to hear the basis for my

8     objection.

9            THE COURT:  Counsel approach.

10           (Sidebar off the record.)

11           THE COURT:  We're back on the record.

12           The Court's going to sustain the objection with regard to

13     the utilization of the term "offense conduct," and the Court

14     will not -- that will not -- that conclusion will not be part

15     of the consideration.

16           The Court also, with regard to necessarily why the

17     charges were not -- charges, possible charges were not

18     pursued, will not go there.

19           The agent has every right to testify with regard -- I

20     believe, every right with regard -- to testify with regard to

21     her investigation surrounding these offenses and other

22     activity as permitted in such a hearing.

23           So counsel, Ms. Rossi, are you clear?

24           MS. ROSSI:  I think so, Your Honor.  Thank you very

25     much.

ANDREA KINZIG - DIRECT                                      76

1              THE COURT:  Mr. Anderson, anything further?

2              MR. ANDERSON:  Not at this time.  Thank you, Judge.

3              THE COURT:  All right.

4              MS. ROSSI:  Thank you, Judge.

5    BY MS. ROSSI:

6    **Q.**   Agent Kinzig, did you have reason during your

7    investigation to review police reports filed in 2005 that

8    concerned Mr. Roberts's minor cousins?

9    **A.**   Yes.

10   **Q.**   Approximately how old were those minor cousins in 2005?

11   **A.**   Based on the report, they were three and five years

12   old.

13   **Q.**   Did you review any police reports that reference medical

14   examinations that were performed on these minor cousins?

15   **A.**   Yes.

16   **Q.**   Could you please describe for the Court just generally

17   and broadly what happened and what you learned based on your

18   review of these records?

19             THE COURT:  Hold on just a second.

20        Do you want a continuing objection, Mr. Anderson, to this

21   whole --

22             MR. ANDERSON:  Your Honor, I do.  Again, I believe

23   that although this is a sentencing hearing and hearsay is

24   permissible, now we're about at the fifth level of hearsay.

25   She's testifying about her review of a medical report from 20

1    years ago that did not result in the filing of charges because

2    of lack of corroborating evidence.

3         At some point, I think the Court can make a decision as

4    to what is relevant for sentencing in this --

5              THE COURT:  I have already ruled with regard to why

6    charges weren't -- I'm not considering any of that.  Counsel's

7    just asking about her investigation and her interviews, and

8    I'm overruling that, but I will allow the continuing

9    objection.

10             MR. ANDERSON:  Thank you, Judge.

11             MS. ROSSI:  Your Honor, just for the record, may the

12   government note the response is that it goes to its weight,

13   not its admissibility?

14             THE COURT:  All right.

15             MS. ROSSI:  Thank you, Your Honor.

16   BY MS. ROSSI:

17   Q.   Do you remember the question?

18   A.   Could you repeat the question, please?

19   Q.   Absolutely.  Just very generally speaking, could you

20   describe for the Court what you learned about this incident,

21   and specifically anything medical related?

22   A.   Yes.  The three cousins spent the week with

23   Mr. Roberts's mother.  On one evening the three cousins were

24   cared for by Mr. Roberts while the mother was away.  When

25   they returned to their mother's residence, one of the minors

1    reported that Mr. Roberts had put what he referred to as his

2    ding dong into his and his brother's butt, as well as into

3    his sisters, what he referred to as "to-to."

4         The children were taken for a medical evaluation.  The

5    one minor also disclosed or reported to a doctor that

6    Mr. Roberts had put his penis into his mouth.

7         The doctor evaluated the three minors, found that there

8    were injuries to one of the minor's anus that the doctor

9    characterized as being Level 3.  And the doctor explained

10   that a Level 3 characterization meant, at least at that

11   time, that there were injuries that were consistent with --

12   that were probable of a sexual assault but were not definite

13   of a sexual assault.

14   **Q.**   Thank you.  I'd like to move on to Mr. Roberts's conduct

15   with Minor A.

16        How old was Mr. Roberts's cousin, Minor A, when

17   Mr. Roberts abused him?

18   **A**   Eleven to 12 years old.

19   **Q.**   Did Mr. Roberts ever blackmail Minor A in relation to the

20   abuse?

21   **A**   Yes.  There was an incident that Minor A reported that

22   when he was spending the night at Roberts's house, Minor A

23   broke a window with the baseball.  And Minor A reported that

24   Roberts told him that if he would not allow -- he, meaning

25   Minor A -- would not allow Roberts to take a photograph of

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    him in the shower, he would tell his -- that Mr. Roberts

2    would tell Minor A's parents that Minor A had broken the

3    window.

4    **Q.**   And it's correct that Minor A and Mr. Roberts were

5    cousins and had an ongoing familial relationship, right?

6    **A.**   Correct.

7    **Q.**   So with regard to minor identified as YY, what happened

8    there, and what was your investigation into that conduct?

9    **A.**   There were five videos that were recovered from

10   Mr. Roberts's external hard drive that depicted Minor YY

11   performing oral sex on Mr. Roberts.  Geolocation information

12   embedded in the excess data for two of the files did, in

13   fact, identify that those video recordings were produced at

14   the residence where he was living.

15        Two of the recordings were produced in 2011 when Minor

16   YY was nine years old, and three of the recordings were

17   produced on an unknown date, but it would have been sometime

18   on or before September of 2015, which would have been when

19   Minor YY was 13 years old or younger.

20   **Q.**   And did you interview this minor after you discovered

21   these videos?

22   **A.**   Yes.

23   **Q.**   And what did Minor YY tell you about what happened?

24   **A.**   He indicated that he had tried over the years to block

25   out what had happened, but he did have some recollection of

1    performing oral sex on Mr. Roberts.  He definitively

2    identified himself in three of the videos.  The other two

3    videos, because he was so young, he didn't provide a

4    definitive identification but did identify that it did look

5    at least consistent with him.

6         The video, the still images from those two videos that

7    Minor YY wasn't definitive of being of him were shown to his

8    uncle as well as his sister, and they did positively

9    identify Minor YY as being depicted in those two videos.

10   **Q.**    Turning to the -- turning to Mr. Roberts's conduct with

11   regards to Minor E, is it accurate that Mr. Roberts began

12   abusing Minor E when Minor E was 13 years old?

13   **A.**    That is correct.

14   **Q.**    Approximately how long did the abuse continue?

15   **A.**    From 13 until he was 18 years old, so into adulthood.

16   **Q.**    Was this the only long-term abuse of a minor that

17   Mr. Roberts engaged in, to your knowledge?

18   **A.**    No.  There were other minors who Mr. Roberts had long-

19   term relationships with, ranging from one to three years.

20   **Q.**    Based on your training and experience, what is the impact

21   on victims of a long-term abuse of several years?

22   **A.**    Among other impacts, there can be withdrawal from

23   family members and friends; a drop in academic performance

24   and other activities like sporting activities; anxiety;

25   depression; engaging in risky behaviors such as risky sexual

1    behaviors; substance and alcohol abuse; and other long-term

2    mental health issues.

3    **Q.**   Thank you.  Turning now to Slide 5 of Government's

4    Exhibit 8.  Can you tell us about Roberts's "Fake Girl"

5    scheme?

6    **A.**   So one of the schemes that Mr. Roberts used when

7    communicating with minors was he posed as a minor female in

8    his communications with a number of the minor males, posed

9    as somebody having a romantic interest in these minor males.

10   He used a number of photographs of females, both clothed as

11   well as nude and sexually explicit images of these females,

12   that he sent to the minors with the intent of obtaining

13   similar pictures in return.

14        On his external hard drive, he had a file folder called

15   "Fake Girl" that he used to store a number of the images

16   that he sent to the minor males, including the two that are

17   depicted on the screen, among others that included nude and

18   sexually explicit images.

19   **Q.**   For approximately how many years did Mr. Roberts use the

20   fake girl ruse to entice minor boys to send him child

21   pornography?

22   **A.**   At least from 2009 through 2020.  There could have

23   continued further, such as, you know, anything that was

24   possibly done on his iPhone.  But the last instance that I

25   was able to identify of him using that scheme was in 2020

1    based on the records I have to date.

2    **Q.**    And I'm sorry.  Could you repeat for me, when was the

3    first year that you're aware of?

4    **A.**    2009.

5    **Q.**    2009 to 2019?

6    **A.**    To 2020.

7    **Q.**    2020, thank you.  While Mr. Roberts was pretending to be

8    this teenage girl, did he use any tactics that you would

9    consider particularly coercive; and if so, could you describe

10   those?

11   **A.**    Well, like I just mentioned, he sent nude and sexually

12   explicit images to the minors and then told the minors that,

13   you know, that he deserved to have similar pictures sent to

14   him in return.

15        He told the minors that sending nude pictures and/or

16   videos was normal.  He said that talking about sex was

17   normal.  He offered to be a type of mentor to some of these

18   males, somebody that they could talk to about sex and their

19   sexuality.

20   **Q.**    Did any of the minors Mr. Roberts communicated with

21   express discomfort about what Mr. Roberts was saying to them?

22   **A.**    Yes.  There were minors who directly told them that

23   they did not want to send any nude pictures to him.  Some of

24   the minors said, for example, that, you know, because of

25   their age, because they were minors they didn't want to get

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    in trouble for sending any pictures.  Some just simply said

2    they didn't want to send them.  Some talked about the fact

3    that they were undeveloped and they were embarrassed by this

4    and didn't want to send pictures of that type of -- send

5    pictures of themselves, and he did continue to make the

6    requests of minors.

7    **Q.**   Based on your training and experience, would you say that

8    Mr. Roberts's use of this "Fake Girl" scheme was

9    sophisticated?

10   **A.**   Yes.  I mean, it does.  You know, for somebody to

11   pretend to be somebody that they're not, you know, for an

12   adult male to pretend to be a minor female in communications

13   with minors over a, you know, what in some cases were one to

14   three years -- you know, not all of them were that long

15   periods of time -- but it does involve some planning,

16   foresight, a lot of effort.  It does reflect his ability to

17   manipulate minors, to be able to give them what they needed

18   in order to send him nude pictures.

19        Based on the chats, it did appear that some of the

20   minors thought that they were in love with the female

21   persona, and there were some of the victims who have been

22   interviewed, including victims who are now adults as well as

23   some victims that are still minors, who expressed a

24   significant amount of discomfort and unease when they were

25   told that they were not talking to who they thought they

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    were talking to.

2    **Q.**   Did Mr. Roberts use the specific "Fake Girl" scheme on

3    any of the victims that he actually had contact with?

4    **A.**   You mean contact with online or contact with in person?

5    **Q.**   Thank you for that clarified question.  Contact in

6    person.

7    **A.**   Yes, with Minor A.  In August of 2009, Mr. Roberts

8    communicated with Minor A via email using the "Fake Girl"

9    persona.  And he was able to obtain at least sexually

10   explicit image of Minor A while using this persona.

11   **Q.**   And so Mr. Roberts did this to Minor A years after he

12   physically abused Minor A and produced the Polaroid

13   photographs of Minor A; is that correct?

14   **A.**   Yes, so it would have been about one to two years

15   later.

16   **Q.**   Is Minor A aware of this?

17   **A.**   Generally.  I didn't want to upset him too much because

18   he was already dealing with a lot, but he's somewhat aware

19   of what happened.

20   **Q.**   What was his reaction when he found out that this teenage

21   girl was not, in fact, a teenage girl?

22   **A.**   Obviously, not happy.

23   **Q.**   Did Mr. Roberts reach out to any of Minor A's friends and

24   attempt the same scheme with them?

25   **A.**   Yes.  There were at least three other minor males who

1    were friends or schoolmates of Minor A that Mr. Roberts used

2    this persona with to obtain nude and sexually explicit

3    images of.

4    **Q.**   What was Minor A's reaction to learning that his friends

5    were also victims of Mr. Roberts?

6    **A.**   That made him feel additional shame and embarrassment

7    about what happened.

8    **Q.**   I'm now showing you Slide 6 of Government's Exhibit 8.

9    In addition to the "Fake Girl" scheme, Agent Kinzig, did

10   Mr. Roberts use any other methods in order to obtain child

11   pornography from minors?

12   **A.**   Yes.  He offered to pay other minors in either currency

13   or gift -- typically in gift cards for them to engage in

14   sexually explicit conduct.  This was often used during the

15   live video chats that he recorded.  He offered minors gift

16   cards to gaming systems such as Nintendo, X-Box, Fortnite,

17   and other similar gaming applications.

18        And during the execution of the search warrant at

19   Mr. Roberts's residence in February 2023, there were

20   approximately 23 of these gift cards that were consistent

21   with the ones that were displayed during the live video

22   chats and/or were described by the victims that were

23   recovered on a -- on or near a desk in his computer room.

24   **Q.**   Just a quick clarifying question.  I believe you said

25   that they were recovered, these gift cards, in February 2023.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

ANDREA KINZIG - DIRECT                                          86

1    Did you mean February 2022?

2    **A.**    I'm sorry.  Yes.  Thank you.

3    **Q.**    Thank you.  Turning now to Slide 7 of Government's

4    Exhibit 8, Agent Kinzig, how would you characterize

5    Mr. Roberts's behavior whenever in the past he's been

6    confronted with allegations that related to him committing

7    offenses against children, specifically sexual offenses

8    against children?

9    **A.**    He's always either denied the allegations or refused to

10   provide any statements.

11   **Q.**    Was there an incident that occurred in 2017 in which

12   Mr. Roberts provided false information to law enforcement?

13   **A.**    Yes.  He was actually interviewed, I believe, in

14   January of 2018 regarding a cyber tip line report that had

15   been submitted by Snap Inc regarding a Snapchat account that

16   was believed to be utilized by Roberts to obtain trade or

17   otherwise acquire one or more child pornography files.  He

18   was interviewed by a detective of the Huber Heights Police

19   Department, and he claimed that somebody else must have used

20   his IP address and denied that he had ever sent any explicit

21   pictures or videos to anybody.

22   **Q.**    Did you interview an individual who is an uncle of victim

23   YY?

24   **A.**    Yes.

25   **Q.**    How -- what was Mr. Roberts's relationship to the adult

ANDREA KINZIG - DIRECT                                        87

1    individual who's the uncle of victim YY?

2    **A.**    They were roommates, previously roommates.

3    **Q.**    And for many years?

4    **A.**    Yes.  It was a number of years.  I can't recall exactly

5    how many, but it was multiple years.

6    **Q.**    Did the uncle tell you -- or did you ask the uncle

7    anything about his knowledge of any sexual offenses against

8    children that Mr. Roberts might have told him about?

9    **A.**    He did refer to one of the incidents, or I should say

10   Mr. Roberts did tell the roommate about one of the incidents

11   that occurred at the store that he was working at involving

12   one of the minor males, and Mr. Roberts's response to that

13   was that some dumb Mexican lady had accused him of doing

14   something to her son.

15   **Q.**    And specifically that she had reported him for touching

16   her son's butt; is that correct?

17   **A.**    Correct, yes.

18   **Q.**    Can you please tell the Court about Mr. Roberts's

19   behavior after you served the search warrant on his residence

20   in February of 2022?

21   **A.**    Yes.  He did continue communicating with Minors A, E,

22   and F after the execution of the search warrant in February

23   2022.  He told those minors -- well, and actually two of

24   them were -- Minor A was an adult now and Minor E eventually

25   became an adult.  But he told Minors A, E, and F about the

1    search warrant that was executed at his residence, about law

2    enforcement's investigation.  He told them about his plans

3    to kill himself before he was arrested.  I know that caused

4    some anxiety to all three of those minors and could have

5    impacted their involvement in the investigation.

6         He did continue communicating with at least Minors E

7    and F up to the day that he was arrested in June 2022.

8    Also, after he was -- after the search warrant was executed,

9    he at some point began hiding in his mother's retirement

10   community, hiding from law enforcement, which was a

11   residence where he was not supposed to be living at.

12        He had a friend or acquaintance regularly check docket

13   systems for any warrants that may have been issued for him

14   that appeared to be in an effort to potentially commit

15   suicide before he was arrested.

16        When he was -- on the day that he was arrested in June

17   of 2022, when law enforcement officers were approaching the

18   mother's retirement community, he did see a marked unit

19   approach the unit.  He fled from his mother's unit, hid

20   under a stairwell.  Officers, after searching -- or checking

21   his mother's residence, had to search the complex and found

22   Mr. Roberts hiding under a stairwell.

23   **Q.**   And it's at that time, I believe you previously

24   testified, that he had a phone that he then powered off?

25   **A.**   No.  The iPhone that he powered off, that was from the

ANDREA KINZIG - DIRECT                                          89

 1    February 2022 search warrant.  There was another search

 2    warrant that was recovered at that time.

 3    **Q.**    Thank you for that clarification.  There was a phone

 4    related to Mr. Roberts's presence in the stairwell; is that

 5    correct?

 6    **A.**    There was, yes.

 7    **Q.**    Okay.

 8    **A.**    That one has been examined.

 9    **Q.**    And has child pornography files on it?

10    **A.**    It does not.  It does have communications with Minors E

11    and F, but it did not have any child pornography files.

12    **Q.**    Thank you for that clarification.  Minor E, specifically

13    you've testified, he continued talking to after agents

14    executed a search warrant at his residence in February 2022.

15    Just for clarification, Minor E is the 13- to 18-year-old

16    victim that Mr. Roberts had an ongoing relationship with?

17    **A.**    Yes.

18    **Q.**    Do you believe that that relationship involved sexual

19    offenses against Minor E?

20    **A.**    I do.  When Minor E was interviewed, he basically said

21    that Mr. Roberts did have some sort of sexual contact with

22    him but he didn't want to talk about it, that it was too

23    much for him to talk about at that time.  Minor A, when he

24    was interviewed, he did say that Roberts had disclosed to

25    him, Minor A, that Roberts had, in fact, had sex with Minor

1    E.

2    **Q.**   And had had sex with Minor E when Minor E was a minor?

3    **A.**   He did not specify the age, but I know at least at one

4    point it was at least reflective of when he was 17, but he

5    did not specify at what age Mr. Roberts began having sex

6    with Minor E.

7    **Q.**   Based on your training and experience, what might be the

8    long-term impacts on Minor E, based on this five-year

9    relationship with Mr. Roberts?

10   **A.**   Sure.  Similar to what I previously stated about long-

11   term impact -- or impacts of long-term relationships, again,

12   it can be withdrawal from family members and friends; drops

13   in grades or academic performance; anxiety; depression;

14   long-term mental health issues; substance abuse.

15   **Q.**   I'd like you to turn to the exhibit binder that's in

16   front of you.  Could you please briefly look through the eight

17   exhibits that are in there and confirm that you are familiar

18   with these exhibits?

19   **A.**   Yes.

20   **Q.**   To the best of your knowledge, is all the information

21   contained in each exhibit accurate?

22   **A.**   To the best of my knowledge, yes.

23   **Q.**   I'd like you to turn to Government's Exhibit 5, which I

24   am not going to display on the screen due to the nature of the

25   exhibit.  Can you please tell the Court what Exhibit 5 is?

1    **A.**   These are sanitized or otherwise appropriate images of

2    the victims of Mr. Roberts's child pornography offenses.

3    The first three pages of actual photographs that are

4    contained on the exhibit contain pictures -- sanitized

5    pictures of the victims to have been fully identified to

6    date.  Essentially, all or nearly all of these pictures were

7    either one of the appropriate pictures or non-child

8    pornography pictures that the minors had sent to Mr. Roberts

9    or were ones that I cropped to only reflect their faces and

10   not any of the inappropriate nudity.

11       The next four -- yes, four pages of pictures, the ones

12   starting saying "Email User 2," et cetera, those are the

13   unidentified victims to date.  And again, using sanitized

14   pictures, otherwise appropriate pictures.  I believe in one

15   case -- or, I'm sorry -- in two cases I ended up using a

16   Facebook photograph and a driver's license photograph.  But

17   there are a couple or even more than a couple of the minors

18   who I was not able to obtain any sort of appropriate

19   pictures for.  So they just had a placeholder that said

20   something to the effect of Skype User 3 or Twitter User 10.

21       MS. ROSSI:  Your Honor, I have no further questions

22   for Agent Kinzig, apart from moving Government's Exhibits 1

23   through 8 into evidence, and specifically with Exhibit 5,

24   moving that into evidence under seal.

25       THE COURT:  Well, I'll reserve my ruling.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1           Do you have anything?

2                  MR. ANDERSON:  On cross-examination?

3                  THE COURT:  Yes.

4                  MR. ANDERSON:  Yes, I do.  Judge, are we a hard stop

5      at noon?

6                  THE COURT:  We are a hard stop at noon.  But don't

7      worry, if you are not done, we will start again some other

8      time.

9                  MR. ANDERSON:  I appreciate it, Judge.  Thank you.

10          I think I should be able to finish by then, Judge.

11                 THE COURT:  That's totally up to you, Mr. Anderson.

12                          **CROSS-EXAMINATION**

13     BY MR. ANDERSON:

14     **Q.**   Agent Kinzig, you've obviously reviewed the presentence

15     report in this case?

16     **A.**   No.

17     **Q.**   You have not read it, okay.

18     **A.**   I don't think I'm allowed to.

19     **Q.**   Forgive me.  I misspoke.  You have seen the indictment in

20     this case, and you are familiar with the plea agreement in

21     this case; is that correct?

22     **A.**   I am, yes.

23     **Q.**   And specifically, Mr. Roberts has pled guilty to

24     production of child pornography -- I believe that was Count 1

25     of the indictment -- is that correct?

ANDREA KINZIG - CROSS                                                93

1    **A.**   Correct.

2    **Q.**   And there is one victim in Count 1; is that correct?

3    **A.**   Yes.

4    **Q.**   And which minor is that again?

5    **A.**   Minor A.

6    **Q.**   That's Minor A, okay.  And specifically, the images that

7    were produced here were produced, we believe, around 2007,

8    right?

9    **A.**   2007 or early 2008.

10   **Q.**   Somewhere in that ballpark?

11   **A.**   Um-hmm, yes.

12   **Q.**   All right.  So we're talking about images that were

13   produced, is that 16 years ago?

14   **A.**   That sounds -- 15 to 16 years ago.

15   **Q.**   15 to 16 years ago.  And these were Polaroid images; is

16   that right?

17   **A.**   Correct.

18   **Q.**   And at the time, that would have made Mr. Roberts -- 15

19   or 16 years, he's 38.  So he would have been maybe 21 or 22.

20   Does my math hold up?

21   **A.**   I believe he was born in '85.  So he would be roughly

22   around 22 years old, yes.

23   **Q.**   22, and the victim was 11 or 12.  I think the PSI gave

24   the benefit of the doubt and said he was 12.  So roughly a

25   ten-year age difference between Mr. Roberts and the victim in

ANDREA KINZIG - CROSS                                              94

1    Count 1; is that fair?

2    **A.**    Yes.

3    **Q.**    Now, Mr. Roberts was never charged with any criminal

4    offense for any contact with Minor A; is that correct?

5    **A.**    No, that was never reported to law enforcement, and the

6    Polaroid photos were never known until the current

7    investigation.

8    **Q.**    And so Minor A did not report anything to law

9    enforcement, to your knowledge?

10   **A.**    Not back then.  He did in 2022.

11   **Q.**    So that was some 16 years later?

12   **A.**    Yes.  If the math is correct, yes.

13   **Q.**    Okay.  Count 2 of -- excuse me.  Count 15 is the second

14   count of conviction.  That's coercion and enticement; is that

15   correct?

16   **A.**    Yes.

17   **Q.**    And there was a specific minor that was identified in

18   that count, right?

19   **A.**    Yes.

20   **Q.**    And how old was that minor?

21   **A.**    If you give me a moment to look at the chart.

22          Was he Minor C?

23   **Q.**    I believe that's correct.  I believe he might have been

24   12 years of age.

25   **A.**    Yes.  I'm sorry.  I'm looking at the wrong line.  Yes,

ANDREA KINZIG - CROSS                                      95

1    Counts 15 to 17 in the indictment relate to Minor C, who was

2    12 years old at the time of the production of the child

3    pornography files.  I'm sorry about that.

4    Q.    Right.  And this child pornography were images of Minor

5    C, correct?

6    A.    Correct.

7    Q.    Mr. Roberts is not accused or alleged to have had any

8    contact with Minor C; is that right?

9    A.    That is correct.

10   Q.    And, in fact, Mr. Roberts has never been charged with any

11   sexual contact offense with a minor; is that correct?

12   A.    Up until now, yes.

13   Q.    Well, specifically in this indictment, was he charged

14   with an actual contact offense of a minor?

15   A.    The production of child pornography, which involved

16   contact offenses, yes.

17   Q.    Okay.  Well, let's talk about that.  Because Count 1, the

18   Production of Child Pornography, that he pled guilty to, that

19   was the eight Polaroids, right?

20   A.    It was one of the Polaroid photos, yes.

21   Q.    And what did that one Polaroid depict, that you would

22   consider to be sexual contact?

23   A.    I would have to go back and look at which specific

24   Polaroid photo there was, but there were two Polaroid

25   photographs were which acknowledged in the statement of

1    facts as being ones that he produced that involved -- one

2    involving Mr. Roberts performing fellatio on Minor A and one

3    involving Minor A performing fellatio on -- I don't know

4    which way I said.  One both ways for fellatio; one of

5    Roberts performing on Minor A and one of Minor A performing

6    on Roberts.

7    **Q.**   Again, Minor A was 12 years of age, approximately?

8    **A.**   Yes.

9    **Q.**   And Mr. Roberts was 21 or 22 years of age?

10   **A.**   Yes.  I think probably 22, but roughly around that age,

11   yes.

12   **Q.**   And that's depicted in two of the Polaroids?

13   **A.**   Correct.

14   **Q.**   The other Polaroids were just child pornography in the

15   sense that they were lewd and lascivious exhibitions of the

16   12-year-old, right?

17   **A.**   Correct, correct.

18   **Q.**   And, of course, production of child pornography in and of

19   itself is not a contact offense, correct?

20   **A.**   It can involve a contact offense.

21   **Q.**   But in and of itself, that's not an element that has to

22   be proved.  You can produce child pornography without any

23   contact; is that correct?

24        MS. ROSSI:  Your Honor, I have to object just

25   because it calls for a legal conclusion.

1              THE COURT:  Well, I understand your point,

2      Mr. Anderson.  There's no reason for the agent to --

3              MR. ANDERSON:  That's fine.  I'll withdraw the

4      question, Judge.

5      BY MR. ANDERSON:

6      Q.   So, Agent Kinzig, except for the conduct described in

7      Count 1 that we just talked about with Minor A, Mr. Roberts

8      has never been charged with a contact offense against a minor;

9      is that correct?

10     A.   Correct.

11     Q.   Okay.  Now, one of the exhibits -- and part of your

12     testimony did talk about actual contact offenses that you

13     believe Mr. Roberts has committed; is that fair?

14     A.   Which -- where are you referring to?  Are you referring

15     to a particular exhibit?

16     Q.   Yes.  If you take a look at Government Exhibit 1.

17     A.   Yes.

18     Q.   Okay.  Do you have Government Exhibit 1?

19     A.   Yes.

20     Q.   I believe that consists of two pages?

21     A.   Yes.

22     Q.   Is that right?  And in the notes, it says that "Yellow

23     shaded rows represent Roberts's actual and attempted contact

24     offenses with minors."  Is that right?

25     A.   Yes.

1    **Q.**   So the ones that are shaded in yellow are allegations

2    that Mr. Roberts actually committed a contact offense with a

3    minor?

4    **A.**   Yes.

5    **Q.**   Okay.  Now, I understand that he was charged with

6    production of child pornography as it relates to Minor A and

7    that there were two Polaroids that depicted sexual contact.

8    But with respect to these other shaded yellow instances, there

9    has never been any criminal charges filed against Mr. Roberts;

10   is that right?

11   **A.**   That is correct.

12   **Q.**   Okay.  So he's never received an indictment.  He's never

13   been brought before a fact-finder and had those facts

14   determined in a court of law; is that correct?

15   **A.**   Correct.

16   **Q.**   And I believe you indicated that with respect to at least

17   some of these shaded yellow -- some of this shaded yellow

18   conduct, there was a decision not to charge Mr. Roberts

19   because of insufficient corroborating evidence; is that right?

20   **A.**   I don't know if that's the exact reason.  I just said

21   that based on the review of the report and what I know about

22   these cases, that that appeared -- could be a possible

23   reason for why at least some of them were declined was the

24   lack of enough supporting evidence for prosecution in a

25   court of law.  But I never talked to the prosecutor to say

ANDREA KINZIG - CROSS                                          99

1   was that your reason for declining the case.

2   **Q.**   Okay.  So it would be absolute speculation on your part

3   to testify as to why charges of contact offenses were never

4   brought against Mr. Roberts.  You'd be completely speculating?

5   **A.**   Speculating with some experience in these type of

6   cases, but I -- but you are correct, I did not talk to the

7   prosecutor to find out specifically why they declined

8   prosecution.

9   **Q.**   And as we sit here today, charges have not been brought,

10  to your knowledge, against Mr. Roberts about these instances

11  of alleged contact with minors; is that correct?

12  **A.**   That is correct.

13  **Q.**   Okay.  Agent Kinzig, you are familiar with the plea

14  agreement in this case; is that correct?

15  **A.**   I am.

16  **Q.**   I don't know if you have a copy of it in front of you.

17  **A.**   I think I have one, but I don't -- I have the statement

18  of facts but not the entire plea agreement.

19  **Q.**   That's what I wanted to focus on.

20  **A.**   Sure.

21  **Q.**   You --

22  **A.**   I have it in front of me.

23  **Q.**   Okay.  You gave some testimony about a victim, Minor YY.

24  Do you recall that?

25  **A.**   I do.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    **Q.**    And this is -- and I believe you testified that allegedly

2    Mr. Roberts sexually abused Minor YY back in February of 2011?

3    **A.**    Yes.

4    **Q.**    Okay.  Now, obviously, Mr. Roberts was not charged in

5    this federal indictment with that conduct, correct?

6    **A.**    No.  The identification of that victim happened only

7    within early 2023.

8    **Q.**    But he has not been charged with that offense?

9    **A.**    Not at this time.

10   **Q.**    And he's not been charged by the state for that offense?

11   **A.**    Not at this time.

12   **Q.**    And he did not admit to that conduct in the statement of

13   facts; is that correct?

14   **A.**    It was not known at the time of the plea agreement.

15   **Q.**    My question was has he admitted to that conduct as he

16   sits here today?

17   **A.**    No.

18   **Q.**    So he has not been charged with it, correct?

19   **A.**    Not at this time.

20   **Q.**    And he has not admitted it?

21   **A.**    No.

22   **Q.**    And you do not know whether or not charges will be filed

23   for that conduct that allegedly occurred in 2011; is that

24   correct?

25   **A.**    At this time, I don't know.

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   **Q.**   In fact, in the statement of facts attached to the plea

2   agreement, he did acknowledge a significant number of minors

3   that he communicated with via the Internet; is that correct?

4   **A.**   Yes.  Those were ones that we had been, based on the

5   investigation, been able to identify at that time.  But our

6   investigation did continue.

7   **Q.**   Okay.  And again, none of those minors that are

8   referenced in the statement of facts, none of that involves

9   contact on the part of Mr. Roberts with those minors; is that

10  correct?

11  **A.**   Except for Minor A.

12  **Q.**   Minor A is the individual who was 12 years old back in

13  2007; is that right?

14  **A.**   Correct.

15  **Q.**   Okay.  None of the other minors, though, involve any

16  contact, physical contact between Mr. Roberts and them; is

17  that correct?

18  **A.**   Well, there are -- Minor E, as we previously discussed,

19  did disclose some sort of sexual contact that he didn't want

20  to disclose at the time.

21  **Q.**   We don't know what that was?

22  **A.**   We don't, no.

23  **Q.**   Okay.

24  **A.**   Other than the fact that Minor A said that it was

25  sexual intercourse.

1    **Q.**   If I could turn your attention to Government's Exhibit --

2    one second.  I believe it's Government Exhibit 2.  It's a

3    summary of all communications with minors.

4    **A.**   Yes.

5    **Q.**   Do you see what I'm referring to?  This is a chart that

6    you prepared in anticipation of your testimony, right?

7    **A.**   Yes.

8    **Q.**   And it's self explanatory.  It breaks down the total

9    number of minors in the first column, and then the age range

10   of known minors in years.  Do you see that?

11   **A.**   I do.

12   **Q.**   Okay.  Now, if we go down to the column referring to

13   "Skype files produced by Roberts via screen recordings and

14   screenshots."

15   **A.**   I see that line.

16   **Q.**   There's a total of 12 minors that you have identified.

17   **A.**   12 total that he communicated with.

18   **Q.**   Okay.

19   **A.**   That does not necessarily mean that there were 12 that

20   produced child pornography -- well, if you look at the

21   couple lines over?

22   **Q.**   Um-hmm.

23   **A.**   That also reflects the number of minors that child

24   pornography files were acquired from.  So both 12 that he

25   communicated with and 12 that child pornography files were

ANDREA KINZIG - CROSS                                          103

1    acquired from.

2    Q.    Understood.  And again, these are child pornography that

3    depicts the minors themselves either exposing themselves when

4    Mr. Roberts's on the other end but not Mr. Roberts anywhere

5    near the minors; is that correct?

6    A.    No.  Exposing themselves or masturbating or engaging in

7    other sexually explicit conduct.

8    Q.    The vast majority of his interactions with these minor

9    boys, they involved similar conduct:  masturbation or nudity

10   in general?

11   A.    Yes.  For his online communications, yes.

12   Q.    If we could go back, Agent Kinzig.  Again, you testified

13   pretty extensively.  If we could go back to Government's

14   Exhibit 1.

15   A.    I'm there.

16   Q.    And if we go back to 1999 to 2000, you testified about

17   allegations that Mr. Roberts engaged in sexually explicit

18   conduct with a two-year-old relative, Minor 1; is that

19   correct?

20   A.    Yes.  I documented the allegations that were made by

21   that relative.

22   Q.    Okay.  You have not interviewed that individual, right?

23   A.    No.

24   Q.    Okay.  Likewise, with Roberts's six- to seven-year-old

25   female relative, Minor 2, you have not interviewed that

1    individual?

2    **A.**   No.  And if I may make one slight correction.  I

3    briefly made contact with Minor 1, and basically he said

4    that he doesn't remember what happens to him when he was two

5    years old but his parent might remember.

6    **Q.**   Okay.  But you haven't interviewed him specifically about

7    the allegations?

8    **A.**   Correct.  Other than I asked if he remembered anything

9    about what happened, and he basically said he doesn't

10   remember anything from that age range.

11   **Q.**   I understood.  Still on Government Exhibit 1, and I think

12   we touched on this --

13   **A.**   And I'm so sorry to interrupt you.

14   **Q.**   Go ahead.

15   **A.**   But I don't want to be inaccurate.  The -- did you

16   ask -- the question regarding Minor 2, did you ask me if I

17   interviewed her?

18   **Q.**   Yes.

19   **A.**   I did speak to her, yes.

20   **Q.**   Okay.

21   **A.**   She says that she basically has dreams about what

22   happened, but that is all -- that she has had dreams about

23   being at Mr. Roberts's house and doing -- him doing things

24   like putting beanie bags under her underwear but doesn't

25   have specific memory of him pulling her underwear aside but

1    does have -- at least has had dreams about inappropriate

2    contact by Mr. Roberts.

3    Q.    Okay.  And again, with respect to Minor 1 and Minor 2,

4    you testified about reviewing some medical reports as part of

5    your investigation.  Did that relate to Minor 1 and Minor 2?

6    A.    No, that was Minor 3, 4, and 5.

7    Q.    And again, you're not a doctor?

8    A.    No.

9    Q.    And charges have never been filed?

10   A.    No.

11   Q.    Against Mr. Roberts?

12        I believe you testified that part of that may have been

13   because there was no other corroborating evidence, or were you

14   speculating on that as well?

15   A.    No.  Like you said, I did not talk to the prosecutor.

16            MR. ANDERSON:  Judge, I have nothing further.

17            THE COURT:  All right.

18            MS. ROSSI:  Your Honor, I just have two questions on

19   redirect, if I may.

20            THE COURT:  Okay.

21                    **REDIRECT EXAMINATION**

22   BY MS. ROSSI:

23   Q.    Agent Kinzig, Mr. Anderson asked you about the fact that

24   Mr. Roberts produced the nine Polaroid photographs in 2007 or

25   2008 when Mr. Roberts was approximately 21 or 22 years old; is

1    that right?

2    **A.**    That is right, yes.

3    **Q.**    Did Mr. Roberts ever reproduce those Polaroid

4    photographs?

5    **A.**    He did.

6    **Q.**    Was that in 2018?

7    **A.**    I'm sorry.  I just want to -- yes, August of 2018.

8    **Q.**    So when he reproduced those, he was 33 years old,

9    correct?

10   **A.**    Approximately.

11            MS. ROSSI:  Thank you.  Nothing further.

12            THE COURT:  Anything?

13            MR. ANDERSON:  Nothing based on that.  Thank you.

14            THE COURT:  Any reason this witness cannot step

15   down?

16        Thank you, Agent.

17        Now, first, is there any other witnesses?

18            MS. ROSSI:  No, Your Honor.  But I just realized the

19   Court has reserved ruling on the admissibility of the

20   government's exhibits.  Does the Court need me to lay a

21   foundation for any of those exhibits?

22            THE COURT:  No, I just need you -- my understanding,

23   there was no objection.

24            MR. ANDERSON:  Not to their being admitted, no, Your

25   Honor.

1          THE COURT:  But I need to make -- we need to be

2     clear, the exhibits that you are moving for admission is all

3     of the tabs?

4          MS. ROSSI:  Yes.  Exhibits 1 through 8, Your Honor.

5     I didn't want to take the Court's time and go over all of them

6     extensively, but I am happy to.

7          THE COURT:  They will be admitted without objection

8     then.

9          MS. ROSSI:  Thank you.

10         THE COURT:  And you wanted to admit 5 under seal?

11         MS. ROSSI:  That's correct, Your Honor.  And, in

12    fact, actually, I'd like to admit Exhibit 8 with one redaction

13    to one of the slides; the slide showing the two minor girls

14    under the "Fake Girl" slide, I would like to redact their

15    faces for the public exhibit, so the full exhibit.

16         THE COURT:  Any objection to that, Mr. Anderson?

17         MR. ANDERSON:  No objection.

18         MS. ROSSI:  Thank you.

19         THE COURT:  So 5 will be admitted but sealed and 8,

20    is that what you said?

21         MS. ROSSI:  Yes, Your Honor, a redacted version.

22         THE COURT:  Redacted version.

23       (Government Exhibit 1 through 8, inclusive, were received

24    in evidence.)

25         THE COURT:  Anything else, Mr. Anderson, at this

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1    point in time?

2            MR. ANDERSON:  I have no additional witnesses, Your

3    Honor.

4            MS. ROSSI:  Nothing at this time.

5            THE COURT:  Here's what we'll do counsel, then:

6    We're going to recess the hearing at this time.  We will

7    reconvene.  By that time I will have an opportunity to delve a

8    lot more into your exhibits that have just now been -- your

9    exhibits that have been admitted or the exhibit that will be

10   provided as part of a memorandum, that being the report.

11     I will also be able to review your memoranda prior to

12   continuing the hearing.  And, of course, at that point in time

13   you will be given an opportunity in addition to make further

14   argument with regard to the case, disposition, mitigation of

15   disposition, the factors of sentencing.  Mr. Roberts will be

16   given an opportunity at that time.  And then, counsel, if you

17   need to have any other individuals, any other victims prepared

18   to be part of your presentation.  All right?

19           MS. ROSSI:  Yes, Your Honor.  Thank you.

20           THE COURT:  Anything further?

21           MR. ANDERSON:  Judge, I would like a transcript of

22   the hearing before I prepare my memorandum.  So I'm not sure

23   the turnaround on a transcript, but if I could maybe have 21

24   days after receipt of the transcript I could have my

25   memorandum filed, that should be plenty of time for me.  I

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

1   don't know if the government would oppose that.  And I would

2   assume me might be talking about maybe contemporaneous briefs

3   with the option maybe to reply?

4           THE COURT:  Let's do this:  Transcript will be

5   prepared in three weeks, then 21 days for simultaneous

6   memoranda, and then ten days for any reply that you might want

7   to make.

8           MR. ANDERSON:  Thank you, Judge.

9           MS. ROSSI:  Thank you very much, Your Honor.

10          THE COURT:  Anything further?

11          MS. ROSSI:  Nothing.  Thank you.

12          MR. ANDERSON:  Nothing.  Thank you.

13          THE COURT:  Thank you very much.

14          THE COURTROOM DEPUTY:  All rise.  This court stands

15   in recess.

16      (Proceedings concluded at 12:02 p.m.)

17

18

19

20

21

22

23

24

25

*Mary A. Schweinhagen, RDR, CRR  (937) 512-1604*

```
1                    CERTIFICATE OF REPORTER

2

3            I, Mary A. Schweinhagen, Federal Official Realtime

4      Court Reporter, in and for the United States District Court

5      for the Southern District of Ohio, do hereby certify that

6      pursuant to Section 753, Title 28, United States Code that the

7      foregoing is a true and correct transcript of the

8      stenographically reported proceedings held in the

9      above-entitled matter and that the transcript page format is

10     in conformance with the regulations of the Judicial Conference

11     of the United States.

12

13     s/Mary A. Schweinhagen

14     _____ 20th of September, 2023

15     MARY A. SCHWEINHAGEN, RDR, CRR
       FEDERAL OFFICIAL COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```